851 So.2d 921 (2003)
STATE of Louisiana
v.
Antoine TATE.
No. 2001-KA-1658.
Supreme Court of Louisiana.
May 20, 2003.
Rehearing Denied September 5, 2003.
*926 J. Rodney Baum, Baton Rouge, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, Creighton B. Abadie, Baton Rouge, Tara S. Bourgeois, Barry J. Fontenot, Opelousas, Monisa L. Thompson, Baton Rouge, Counsel for Respondent.
CALOGERO, Chief Justice.
Three young men were killed in a violent, gangland-style ambush and shooting in East Baton Rouge Parish on the night of January 14, 1997; a fourth man, though badly wounded, managed to survive by feigning death. He heard defendant Antoine Tate's voice during the shooting, and provided police with Tate's name. Tate's accomplices later fingered him as one of the shooters. On this and other evidence, a jury found Tate guilty as charged of first degree murder and returned a sentence of death by lethal injection, which the trial court duly imposed. Tate has appealed his *927 conviction and sentence, and, for the reasons that follow, we affirm.

Statement of the Case
On February 3, 2000, after nine days of voir dire and a five-day trial, an East Baton Rouge Parish jury found the defendant guilty of the first degree murders of Chonner Jackson, Joseph Billie, and Sylvester Rowe. One day later, after the penalty phase hearing, the jury sentenced the defendant to death after finding three aggravating circumstances: 1) that the defendant was engaged in the perpetration or attempted perpetration of armed robbery or assault by drive-by shooting, 2) that the defendant knowingly created a risk of death or great bodily harm to more than one person, and 3) that the defendant committed this crime in an especially heinous, atrocious, and cruel manner. La. Code Crim. Proc. art. 905.4(1), (4), and (7). The defendant now assigns twenty errors, some of which are discussed in the main body of this opinion.[1]

Facts
On the night of January 14, 1997, the defendant, Antoine Tate, along with his accomplices, Derrick Jackson, Samuel Williams, Leonard Toney, and Timothy Gross, drove to the north Baton Rouge home of the surviving victim, Mack Thomas, in Tate's white Oldsmobile Cutlass. After arriving at Thomas's home, Toney went inside and talked to Joseph Billie, a known drug dealer, about a possible marijuana purchase from Ike Foster, a man who lived in the area of Rheames Road. While inside, Toney went to the bathroom with Billie and saw a large amount of crack cocaine and money. After leaving Thomas's residence, Toney got into the Cutlass with Tate, Jackson, Williams, and Gross, and began plotting the robbery of Billie to get the drugs and money Toney had seen in the house.
A short time later, the victims, Joseph Billie, Mack Thomas, Sylvester Rowe, and Chonnor Jackson left Thomas's house in a blue Toyota Corolla and drove to the home of Foster. Meanwhile, Tate and Toney, Gross, Jackson, and Williams went to the home of Jackson's aunt and retrieved an SKS assault rifle. The group then proceeded down Rheames Road towards Ike Foster's house. While stopped at the intersection of Milldale and Rheames Roads, the defendant exited the Cutlass with the assault rifle and walked into the woods. Toney then drove the rest of the men to Foster's house.
When they arrived at Foster's residence, Toney got out of the Cutlass, knocked on Foster's door, and discovered that no one was home. Toney, Gross, Williams, and Derrick Jackson then left Foster's house, followed by the Corolla with Thomas, Billie, and Chonnor Jackson inside, with Rowe driving. When the two cars stopped at the stop sign at the intersection of Milldale and Rheames Roads, the defendant stepped out of the woods and began firing the SKS assault rifle into the Corolla. Trying to get away from the gunfire, Rowe drove the car around the Cutlass and sped up Rheames Road. The defendant then got into the driver's seat of the Cutlass, handed the gun to Jackson, and began chasing the Corolla. As the Cutlass approached the Corolla, Derrick Jackson stood up through the sunroof and fired at the other vehicle. The Toyota Corolla struck a truck being driven by Robert Selders, and then it stopped on the side of the road. Once the vehicle stopped, the defendant took the gun from *928 Derrick Jackson, exited the Cutlass, and began firing the assault rifle into the Corolla directly at the four victims. When the gunfire ended, Chonnor Jackson, Billie, and Rowe were dead of multiple gun shot wounds. Tate, Toney, and Derrick Jackson then searched the victims' pockets, looking for money and drugs before they fled the scene.
Mack Thomas survived the incident by pretending to be dead in the back seat of the Corolla. At the hospital, Thomas provided the defendant's name as a shooter, and at trial, he testified that he had heard the defendant's voice at the scene saying to "kill those m____ f____s." In addition, Toney, Gross, and Williams testified against the defendant at trial, pointing to the defendant and Derrick Jackson as the shooters. Furthermore, DNA evidence placed defendant at the crime scene and ballistics testing matched the gun, found hidden in a drainage pipe, to the deceased victims' wounds.

Sufficiency of the Evidence
We first consider the defendant's assertion in assignment of error no. 7 that the State failed to prove beyond a reasonable doubt that the defendant committed the crime of first degree murder. Specifically, the defendant argues that his conviction rests solely on the testimony of his accomplices, who placed the blame on the defendant alone and who all received lesser sentences because of plea bargains with the State. The defendant argues that their testimony is inconsistent and unreliable. He further contends the evidence does not prove beyond a reasonable doubt that he killed any of the victims in this case. Instead, the defendant argues, the evidence shows that Derrick Jackson likely fired the shots that killed the victims, as there was testimony that Jackson fired the assault rifle at the victims' car from behind, that the shots that killed the victims came from behind, and that none of the victims fled their vehicle after it struck the truck. The evidence, in the defendant's view, establishes that the robbery and attack were planned and carried out by Toney and Derrick Jackson.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Captville, 448 So.2d 676, 678 (La.1984). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." Id.
In Louisiana, as a general principle of law, a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat such testimony with great caution.[2]State v. May, 339 So.2d 764, 774 (La.1976); see also State v. Howard, 98-0064, p. 14 (La.4/23/99), 751 So.2d 783, 801. However, when the accomplice's testimony is corroborated by other evidence, such language is not required. Howard, p. 14, 751 So.2d at 801.
After reviewing the evidence in the light most favorable to the prosecution, we conclude the defendant's insufficient evidence argument fails for several reasons. First, in the instant case, all three of defendant's purported accomplices testified against him. While there may have been minor *929 inconsistencies in their testimony, all three testified that the four men went to Thomas's trailer in the defendant's white Cutlass to obtain narcotics and that, after Toney observed money and drugs in the trailer, the group decided to rob the men. Toney, Gross, and Williams also testified that the group went to the home of Derrick Jackson's aunt to get an SKS assault rifle before going to meet the other men, and that the defendant got out of his car, with the SKS assault rifle, at the intersection of Rheames Road and Milldale. Toney, Gross, and Williams testified that the defendant came out of the bushes firing the SKS at the Toyota Corolla the victims were driving. Furthermore, these witnesses testified that when the Corolla took off, the defendant got into the Cutlass, handed the gun to Derrick Jackson, and chased down the Corolla while Jackson fired at the car from the sunroof. The defendant's accomplices also testified that when the Corolla crashed, the defendant then took the SKS rifle from Jackson, approached the vehicle, and repeatedly fired the gun into the car.
The State also presented physical evidence corroborating the witnesses' testimony and the defendant's involvement. This evidence included the fact that co-defendant Gross led police to where the assault rifle was located. Bullets retrieved from the victims, as well as casings and bullet fragments found at the scenes, were matched to this weapon. In addition, blood having DNA consistent with the DNA of one of the deceased victims was found on the defendant's shoe. Furthermore, the State introduced a threatening letter from the defendant to his co-perpetrator, Williams, which was written while the defendant was incarcerated and awaiting trial and which implicated him in the instant crimes.
The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). The jury in the instant case made reasonable credibility determinations in favor of the State and rationally accepted the testimony of the defendant's accomplices, corroborated as it was by the physical evidence.
The defendant also argues that there was no direct evidence he was the person who fired the fatal shots and that the medical evidence and testimony of the co-defendants indicates the fatal wounds were most likely inflicted by Derrick Jackson when he was firing at the Corolla from the sunroof of the defendant's Cutlass.
However, testimony from the assistant coroner, who performed the autopsies on the deceased victims, and from the State's firearm identification expert established that the victims suffered multiple gunshot wounds to different parts of their bodies and that multiple shots were fired upon the victims' vehicle from several directions. Jackson had ten gunshot wounds, two of which struck the back of his head and three of which struck his abdomen. The wounds to either the head or the abdomen could have resulted in death. And one of the wounds to the head was caused by a "tumbling" bullet, that is, one that had struck another object before striking the victim. Rowe suffered four gunshot wounds, one of which entered the back of his chest and another entered the lower back on the right side; the latter perforated internal organs that resulted in exsanguination. Billie suffered seven gunshot wounds, including one to the back of his head, also caused by a "tumbling" bullet, *930 and another to the back of the left chest. Either wound would have been fatal, according to the assistant coroner. Finally, the firearms identification expert counted eighteen shots to the victims' vehicle: four shots from the rear, six shots along the driver's side, and eight shots from the front passenger's side. This evidence indicates that the fatal shots could have come from a direction other than only the rear of the vehicle.
At any rate, so long as the State sufficiently proves that the defendant is a principal and that he possessed the requisite specific intent, a conviction for first degree murder will be upheld. See State v. Anthony, 98-0406, pp. 11-14 (La.4/11/00), 776 So.2d 376, 385-86; State v. Brooks, 505 So.2d 714, 717-18 (La.1987); State v. Holmes, 388 So.2d 722 (La.1980). Here, the defendant was charged as a principal.
A principal is anyone "concerned in the commission of a crime, whether present or absent ... whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." La.Rev.Stat. 14:24. Not all principals are automatically guilty of the same grade of the offense; thus, a principal may be charged with and convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. Brooks, 505 So.2d at 717, citing State v. McAllister, 366 So.2d 1340 (La. 1978). An individual may be convicted only for those crimes for which he personally has the requisite intent. It is not enough that his accomplice have the intent, the State must prove that the defendant had the required mental element. Brooks, 505 So.2d at 717; Holmes, 388 So.2d at 726.
Specific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused. Brooks, 505 So.2d at 717. To establish specific intent the state must show that the defendant pulled the trigger, that he acted in concert with his co-perpetrator, or that he actively acquiesced in the use of deadly force. Anthony, pp. 12-14, 776 So.2d at 386; Brooks, 505 So.2d at 718.
The jury in this case rationally found that the defendant was an active principal in the offense and that he had possessed the requisite specific intent. The defendant was a willing participant with Jackson, Gross, Williams, and Toney in the lethal turn of events on Rheames Road, as evidenced by the fact that the defendant's car was used in the attack and that the defendant was the perpetrator who initially fired on the victims' vehicle, coupled with the fact that he handed the SKS to Jackson and drove the car while Jackson fired at the Corolla. Additionally, the defendant repeatedly fired the gun into the Corolla at the incapacitated occupants, after the Corolla had come to a stop.
The jury reasonably rejected the defendant's theory that he was merely participating in the robbery and that he never intended for anyone to be murdered. Mussall, supra. Thus, in the instant case, a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements necessary to establish that the defendant committed the first degree murders of Joseph Billie, Sylvester Rowe, and Chonnor Jackson during the perpetration or attempted perpetration of an armed robbery[3] or drive-by shooting.[4] *931 Furthermore, the trier of fact could have rationally inferred from the facts and circumstances of this case that the State proved beyond a reasonable doubt that the defendant had acted with specific intent to kill or to inflict great bodily harm upon the victims. Accordingly, this assignment is without merit.

Voir Dire Challenges for Cause
In assignment of error no. 5, the defendant asserts the district court erred by granting the State's challenges for cause of potential jurors Odell McClay, Michael Walls, Janelle Barber, and Ann Lott.[5] According to the defendant, all of these jurors were capable of considering the death penalty and, thus, fit to serve as jurors under Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
A prospective juror is properly excluded for cause because of his/her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852. The basis of exclusion under La.Code Crim. Proc. art. 798(2)(b), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror's views "would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." Witherspoon further dictates that a capital defendant's right under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id., 391 U.S. at 510, 88 S.Ct. at 1777. La.Code Crim. Proc. art. 800(B) provides that a defendant cannot complain of an erroneous grant of a challenge to the State "unless the effect of such a ruling is the exercise by the State of more peremptory challenges than it is entitled to by law." The United States Supreme Court, however, has held that it is reversible error, not subject to a harmless-error analysis, when a trial court erroneously excludes a potential juror who is eligible to serve under Witherspoon, even if the State could have used a peremptory challenge to strike that potential juror. Gray v. Mississippi, 481 U.S. 648, 664, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). To determine the correctness of a trial court's rulings on voir dire, a review of voir dire as a whole must be undertaken, and the trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108; State v. Williams, 457 So.2d 610, 613 (La.1984); State v. Hall, 616 So.2d 664, 669 (La.1993).
We now turn to the first prospective juror whom the defendant claims the court improperly allowed the State to challenge for cause, Ms. Odell McClay. During a colloquy with the court on Ms. McClay's beliefs regarding the death penalty, she stated that she had "mixed feelings about it" and that "it depends on the situation." When asked what types of situations, she acknowledged that many factors would have to be considered, but *932 when pressed, she pointed to the killing of children, the elderly, or large numbers of people as justifying the death penalty. The court noted that very few cases meet those criteria and that, while it is one thing to believe in the death penalty, it is quite another thing to be in a position to make that decision. Ms.McClay said she would have to be objective, but then the following colloquy occurred when the court pressed for a more definitive answer:
COURT: Well, let's get to thelet me put it another way. You have looked at the evidence. You have weighed both sides. You have considered all of the circumstances, and after that consideration you decide, yes, I think this case is appropriate for the death penalty. Now, could you personally vote to impose the death penalty.
JUROR: No. You know why
COURT: Why?
JUROR: Because I believe in giving people a chance, and I think that he should be sentenced to life, you know, imprisonment. And if there is anything you can do with him that would help to modify or change his behavior that would bring about a positive attitude in that particular person, then give him that chance.
COURT: So what you are saying is that even though you believe in the death penalty and you think that there are some cases that it would be appropriate to impose it, as in individual, you would have difficulty doing that?
JUROR: II may. I want to be firm with you. I may have some difficulty. I would have to look at, and I really would have to give it a lot of thought.
COURT: And I think everyone would have to do that, think about it and give it a lot of thought, but the question is, when it comes right down to it and you have got to make your vote one way or the other, if you thought that the death penalty were the right penalty to impose, could you do it?
JUROR: Only in very, verycases where it isit would be necessary. It would have to be necessary. Otherwise, I would
COURT: What do you mean by necessary?
JUROR: If I feel that person deserved it, but I just would have to, you knowI don't know. I just believe in giving people a chance.
Later, the State again questioned Ms. McClay regarding her apparently conflicting statements on the death penalty. The State tried to determine whether there were any other types of cases in which the prospective juror could return a death sentence. When the juror indicated that she could do so, the prosecutor emphasized that the defendant would be put to death if the jury voted unanimously for that sentence. When the State asked Ms. McClay if she would be able to vote for the death penalty knowing that someone would die, she responded:
JUROR: Well, let me tell you this. I have to live and I have to be ableI have to live with myself and, no, I might have to go withI don't believe in it.
Defense counsel then attempted to rehabilitate Ms. McClay regarding her ability to impose the death penalty, explaining the process to determine the sentence. Though Ms. McClay indicated she could vote for the death penalty if she thought it were appropriate, she stated once again that she "really didn't believe in [the death penalty]." And when the trial court again questioned her, Ms. McClay ultimately revealed she would be unable to return a death sentence, as reflected in the following exchange:

*933 COURT: Ms. McClay, I want you to listen to me very carefully. Okay. You've left me somewhat confused on where you stand. On the one hand, you will say that you can't impose the death penalty, and then on the other hand you will say that you can. And then you will say that you can't. And then you will say that you can.
JUROR: Yeah.
COURT: I wanted to know how you feel. I don't want you to tell me what you think I want to hear. I want you to tell me you are the type of person who could vote to put someone to death after listening to the evidence if you thought that was the right penalty to impose, could you personally vote to put someone to death?
JUROR: Well, like I told Mr. Fontenot, you know, I cannotI cannot do it.
Based on the venireperson's statements as a whole, we cannot say that the district court abused its discretion in finding Ms. McClay's views would prevent or substantially impair the performance of her duties. Ms. McClay's testimony on voir dire was confusing and, more troubling, contradictory, depending on who was questioning her. And, in her final answer to the court she unequivocally stated that she personally could not vote to impose the death penalty. Accordingly, the district court, in our view, did not abuse its discretion in granting the State's cause challenge of this prospective juror.
The defendant also complains the district court erroneously granted the State's challenge for cause of prospective juror Ms. Janelle Barber for her views on the death penalty. In response to the court's first questions, Ms. Barber said she did not believe in the death penalty and she could not personally vote to put someone to death. But, under further questioning by the court, Ms. Barber seemed to waver in that stance, explaining that she could give the State a fair opportunity to obtain a death sentence, even in cases not involving children or an elderly person, such as the instant case. But, in her responses to the district attorney, Ms. Barber revealed that she could not return a death sentence under the circumstances of this case:
STATE: ... And, the bottom line is, can you vote in favor of the death penalty, you know, and does your faith present a problem?
JUROR: At this time, no, I could not put him to death.
* * * *
JUROR: I'm trying to be as honest as I can. I have searched my, searched my soul, and the best I can tell you is I'm not a hundred percent sure that I could not put him to death. There is a small amount I mean that says that perhaps I could.
STATE: There is a small amount that says perhaps you could. Well, I'll tell you what, you may be able to help me. In terms of, uh, if you had to say percentage wise, you know, and I know that's very difficult, but can you give me a number to tell me where you are in terms of the lower number being in favor of life, the higher number in favor of, you know....
JUROR: Considering everything in this type of first degree murder?
STATE: Yes, ma'am.
JUROR: Knowing only what I know right now, not knowing anything else that was, you know, that would show me that this was done, uh, in a heinous type way or anything, not knowing any of that right now ... ten percent of me. So, you know....
STATE: ... Can you honestly tell me that right now that you could do *934 that, if it came down to it? Because that's what it's going to come down to.
JUROR: No, I could not.
Following the district attorney's questioning, Ms. Barber answered defense counsel's questions in an apparently contradictory manner:
DEFENSE: All right. And even if, as he put it, you made the decision back in the jury room and you walked back into here to deliver that verdict and you have to look Mr. Tate eye to eye, if there was sufficient evidence, and if you thought that was the right thing in your mind, then you could vote for a death sentence?
JUROR: I have to, uh, I'm trying to be as honest as I can, as Judge Jackson asked us to be. And, as much as I've searched, searched my soul, uh, I cannot say that I would definitely not be able to put Mr. Tate to death at this moment. But I cannot, right now, I could not, you know, knowing what I know, I could not. But I could not honestly say that when it came down to it that I would not do it.
As even these short excerpts reveal, the district court was confronted with a juror who, though stating she could look at the evidence before making a decision, would then respond negatively when asked by the State whether she could vote for a death sentence under the circumstances of this case. Viewing her voir dire testimony as whole, then, the district court understandably could not be certain that Ms. Barber could seriously consider imposing the death sentence in this case. Ms. Barber was steadfast in the respect that she could not vote to impose a death sentence in this case upon the facts as she knew them unless the crime were proved to be committed in a heinous manner. However, there were other aggravating factors the State would be allowed to prove in order to justify a death sentence, namely, as the State alleged, either that the crime was committed during the perpetration or attempted perpetration of an armed robbery or an assault by drive-by shooting, or that the offender knowingly created a risk of death or great bodily injury to more than one person. La.Code Crim. Proc. art. 905.4. Given the prospective juror's apparent inability to accept the law in this regard, the district court did not abuse its discretion in granting the State's challenge for cause.
The defendant also argues the district court erred in granting the State's challenge for cause of prospective juror Ms. Ann Lott. When the court initially questioned Ms. Lott, she stated it would be very hard to vote for the death penalty, but added, "I think I could." Later, when the State questioned her, she stated that she "just didn't know" if she could vote in favor of the death penalty:
JUROR: I really think that, I know that the death, to me the death penalty is the right thing, and I know that if the evidence was there and the person was convicted that I would think that it was the right thing. But, whether or not that I would be able to it, I just don't know.
Ms. Lott went on to state that, "I'm afraid that, even though that I knew it was the right thing to do, that part of me would, would find it too difficult to do. I just, I don't know. I just don't know."
When defense counsel questioned Ms. Lott, her answers again conveyed her inability to vote for the death penalty:
DEFENSE: Ms. Lott, it seemed to me that I heard you kinda changing from when you talked to the judge to when you talked to Mr. Fontenot. I thought you told the judge that you probably could make that decision *935 personally. But then you wound up telling Mr. Fontenot that you couldn't say, I guess, one way or the other, is that pretty accurate?
JUROR: I just keep having to think. I think I can do it. I've been going over this in my head for the past couple of weeks and I keep thinking this is the right, and it's the right thing for our country and our city and our state, and I can do that. And then the thing?
DEFENSE: Sitting in the chair makes a difference?
JUROR: Well, yes, and this thing just keeps coming into my head, this doubt, you know, that says, well, maybe I couldn't do that. And then if Mr. Fontenot was counting on me thinking that I had come into this thing I could, then I got to thinking, well, it's really not fair, he should at least know that there is a doubt there that keeps coming into my mind.
Again, the district court was confronted with a prospective juror whose answers to questions depended upon who was asking them. Those answers nonetheless reveal that Ms. Lott, like Ms. McClay, could not assure the court that she could herself vote to impose the death penalty if she were actually asked to do so by the State, even though she believed that such a penalty was the "right thing" for society. Accordingly, the district court's decision to grant the State's challenge for cause was not an abuse of discretion.
In assignment of error no. 6, the defendant contends the district court erred in denying his challenge for cause as to prospective juror Mr. Glen McDonald.[6]
As discussed previously, the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." La.Code Crim. Proc. art. 798(2)(b); Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852. In the so-called "reverse-Witherspoon" context, the basis of the exclusion is that the juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him...." State v. Robertson, 92-2660, 630 So.2d 1278, 1284; see also Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear." Id. Therefore, if a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993). The district court must, upon a challenge for cause, disqualify a venireperson unable to consider both life and death as penalties. State v. Divers, 94-0756, pp. 8-13 (La.9/5/96), 681 So.2d 320, 324-27; State v. Maxie, 93-2158, p. 23 (La.4/10/95), 653 So.2d 526, 537-38.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial *936 rights and constitutes reversible error. State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686. A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of that discretion. Cross, 93-1189, pp. 6-7, 658 So.2d at 686-87; Robertson, 92-2660, p. 4, 630 So.2d at 1281. A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, the juror has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Id. In this case, the defendant exhausted his peremptory challenges, and thus, the only issue before us is whether the court erred when it denied the defense challenges for cause.
As this court has made clear, the prospective juror who indicates his or her personal preference for the death penalty need not be stricken for cause. State v. Lucky, 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850. Furthermore, not every predisposition or leaning in any direction will rise to the level of substantial impairment. State v. Taylor, 99-1311, p. 11 (La.1/17/01), 781 So.2d 1205, 1216-17.
We turn to the defendant's contention that the district court erred in denying his challenge for cause of venireperson Mr. Glen McDonald. In defendant's view, Mr. McDonald's statement that he would "automatically impose" the death penalty should have disqualified him from serving on the jury. However, a review of Mr. McDonald's entire voir dire examination reveals that, after the district court explained the penalty phase procedure to him, Mr. McDonald was capable of considering both a life sentence and the death penalty. He stated to the court that he could consider the mitigating circumstances and the defendant's background, that he had an open mind on imposing a life sentence, and that he could give the defendant a fair opportunity to persuade him to return a life sentence. Additionally, Mr. McDonald repeated his willingness to impose a life sentence and to seriously consider mitigating circumstances when the State questioned him.
On the other hand, Mr. McDonald did admit to the defense attorney that he would not want himself as a juror if he were in the defendant's position. Such a statement, of course, causes us great concern that the prospective juror might not be able to afford the defendant a fair trial, especially when combined with the prospective juror's initial comments regarding an "automatic" imposition of the death penalty in all murder cases. Trial courts should be alert to such potential bias. However, we have reviewed Mr. McDonald's voir dire responses as a whole, and they indicate a willingness to consider in a serious manner the mitigating circumstances and the imposition of a life sentence. Consequently, based on his entire colloquy, we do not find that the juror expressed "an unconditional willingness to impose a death penalty under any and all circumstances." State v. Chester, 97-2790, pp. 14-15 (La.12/1/98), 724 So.2d 1276, 1285-86. Accordingly, the district court did not abuse its discretion when it denied the defense's challenge for cause of Mr. McDonald.
Similarly, the defendant argues the district court erred in denying the defense's challenge for cause of prospective juror Mr. Carl Thierry, because he indicated that he was "one hundred percent for it [the death penalty]." However, as with Mr. McDonald, a review of Mr. Thierry's voir dire responses as a whole *937 indicate his willingness to consider both a life sentence and the death penalty. Although he said he was "probably more for the death penalty," Mr. Thierry agreed that he could be persuaded to vote for life imprisonment and that he could give genuine consideration to all the mitigating circumstances. Additionally, when questioned by the State, Mr. Thierry responded that the defense would have a fair opportunity to persuade him that life imprisonment is the appropriate punishment and that he could seriously consider mitigating circumstances. Given these responses, we cannot say the district court abused its discretion in refusing to grant the defense's challenge for cause of prospective juror Mr. Thierry.
Accordingly, this assignment of error lacks merit.

Special Jury Instruction on Accomplice Testimony
The defendant also contends the district court erred by denying his counsel's request for a special jury instruction on accomplice testimony. The requested instruction was as follows:
An accomplice is defined as one who is associated with another in the commission of a crime and an accomplice is a competent witness, either for the state or for the defendant. Whether the accomplice has been convicted or not, corroboration is desirable but not always indispensable. The jury may convict on his uncorroborated testimony. And while it is not the rule of law, it is rather the rule of our experience in dealing with that class of testimony that while you may convict upon the uncorroborated testimony of an accomplice, still you should act upon his testimony with great caution, subject to great careful examination of the weight of the other evidence in the case. And you are not to convict upon such testimony alone unless satisfied, after careful examination that you feel you can safely rely on it. What the law means by corroboration of the testimony of an accomplice is not merely the corroboration of the accomplice's narrative and the mere details of how the crime was committed or the crime charged was committed, but some real and independent corroboration tending to implicate the defendant in the commission of the offense charged. It is not sufficient to corroborate an accomplice as to the facts of the case. Generally, he should be corroborated as to some material fact which tends to prove that the accused was connected with the crime that's charged.
Under La.Code Crim. Proc. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is adequately covered by the general charge or in another special charge to be given. State v. Segers, 355 So.2d 238, 244 (La. 1978), rehearing granted on other grounds, 357 So.2d 1 (La. 1978). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Marse, 365 So.2d 1319, 1323 (La.1978); see also La.Code Crim. Proc. art. 921. As we noted above, the "great caution" language is necessary only when the State's case rests on accomplice testimony alone. When the accomplice testimony is corroborated by other evidence, such language is not required. State v. Washington, 407 So.2d 1138, 1147 (La.1981); State v. Murray, 375 So.2d 80, 88 (La. 1979).
In the instant case, the accomplices' account of the crime was corroborated by *938 other independent evidence. The victim, Mack Thomas, corroborated the testimony of the three accomplices. In addition, physical evidence, including shell casings, bullets, the gun, and DNA, was also presented by the State. Furthermore, while the court's general charge did not specifically address the dangers of accomplice testimony, the instructions called for the jury to consider "whether the witness has been offered or has received any advantage or immunity in return for his or her testimony." In addition, the court instructed the jurors that,
You alone shall determine the weight and the credibility of the evidence. You are the sole judges of the credibility of witnesses and of the weight their testimony deserves. You should scrutinize carefully the testimony given and the circumstances under which each witness has testified. In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she has testified, his or her manner or demeanor while testifying, any reason he or she may have for testifying in favor or against the state or the accused.
Given the independent corroborating evidence in the case, we find, as did the trial court, that these instructions provided sufficient guidance to the jurors for evaluating the accomplices' testimony. Accordingly, the trial court did not abuse its discretion in refusing to give the defendant's requested special jury instruction. This claim lacks merit.

Aggravating Circumstances
The defendant also asserts the State did not prove beyond a reasonable doubt the existence of an aggravating circumstance to support the death penalty. Upon sentencing the defendant to death, the jury found three aggravating factors: 1) that the killing was committed during the perpetration and attempted perpetration of an armed robbery and/or the offender was engaged in the perpetration of assault by drive-by shooting; 2) that the offender knowingly created a risk of death or great bodily harm to more than one person; and, 3) that the offense was committed in an especially heinous, atrocious or cruel manner. See La.Code Crim. Proc. art. 905.4.
In support of his argument, the defendant merely points to his previous contention that the evidence was insufficient to support his conviction and argues that the evidence is also insufficient to support the jury's finding of the aggravating circumstances. However, as discussed above, the State presented sufficient evidence to convict the defendant of three counts of first degree murder.
It is true that the State failed to establish that the offense committed by the defendant falls into the category of what we have considered "especially heinous." This aggravating circumstance requires the jury to find beyond a reasonable doubt that there was torture or the pitiless infliction of unnecessary pain on the victim. State v. Flowers, 441 So.2d 707, 715-16 (La.1983). A review of Louisiana cases indicates that the murders in the instant case, though violent, were not "especially heinous." All of the victims were killed within a short time of the car being fired upon numerous times with an SKS assault rifle. These murders cannot be described as torturous or involving the unnecessary infliction of pain, at least no more so than any murder.
In any event, evidence introduced at the guilt phase of trial, and re-introduced during the penalty phase, established quite clearly that the victims had been shot during an attempted armed robbery and/or assault by drive-by shooting. Toney and *939 Williams both testified that a robbery of the victims was discussed by some of the group, including the defendant. Gross testified that Derrick Jackson had proposed "get[ting]" the victims. In addition, Toney testified that, after the defendant shot the four people in the car, they went through each person's pockets looking for things to steal. Finally, Robert Selders, the driver of the truck struck by the victim's Corolla after the initial volley of shots fired by Derrick Jackson, testified that he heard someone say, "why you robbed me, man why you robbed me" and "they robbed me Grace, they robbed me Grace." Thus, the State established that the defendant committed the murders in the course of an armed robbery. Moreover, the State also sufficiently proved that the defendant was a principal to the crime of assault by drive-by shooting. Again, the defendant's accomplices testified that he had driven the white Cutlass while Derrick Jackson fired the SKS at the victim's Corolla.
The failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Letulier, 97-1360, p. 25 (La.7/8/98), 750 So.2d 784, 799; State v. Wessinger, 98-1234, p. 16 (La.5/28/99), 736 So.2d 162, 192. What evidence there was that tended to prove the invalid aggravating circumstance in this case did not interject an arbitrary factor into the proceedings. Evidence of the defendant's conduct, the testimony of his accomplices and the surviving victim, as well as the circumstances leading up to and following the murders were relevant and properly admitted at trial. Further, the remaining aggravating circumstances were amply supported by the evidence. Consequently, no arbitrary factors were interjected into the proceedings. See State v. Roy, 95-0638, pp. 19-20 (La.10/4/96), 681 So.2d 1230, 1242. This assignment of error lacks merit.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. Rule 28, we review every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, we consider whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report (UCSR), and the Department of Public Safety and Corrections (DOC) has submitted a Capital Sentence Investigation (CSI).
The UCSR reveals that the defendant is a African-American male born on March 3, 1970. He was twenty-six years old at the time of the offense. The defendant has three siblings and, though he apparently witnessed some violence at home on the part of his father, he was primarily raised by his mother. He is not married, but has with Roderika Gross three children who were ages 10, 9, and 8 at the time of the report.
As for his educational background, the defendant completed eleventh grade, but never received a high school diploma or G.E.D. The defendant's employment history consists of minimum wage jobs including construction and installing cable lines. He was employed by his uncle cleaning carpets for approximately $1,400.00 a month before he was arrested for the instant crimes.
*940 According to the UCSR, an intelligence evaluation on the defendant revealed him to have a medium IQ of 70 to 100. The defendant is in good physical and mental health, and he states he has never used an illicit substance and does not drink alcohol.
The defendant's criminal history reveals juvenile arrests for simple criminal damage to property and misdemeanor theft. He was placed on six months supervised probation and the cases expired in 1988. The defendant has a history of arrests, including prior convictions for possession of stolen property and possession of stolen things. The instant offenses were committed while the defendant was on parole for the most recent prior offense.

Passion, Prejudice, and Other Arbitrary Factors
The defendant contends that four elements injected passion, prejudice, arbitrariness, and caprice into the proceedings: (1) the trial court erred by denying the defense motion to admit hearsay testimony of Colin Johnson; 2) the State failed to prove beyond a reasonable doubt the existence of an aggravating circumstance to support the death penalty; 3) the trial court failed to grant a mistrial during the State's rebuttal argument during the penalty phase; and 4) the jury used an improper verdict form. These claims have been addressed elsewhere in this opinion or its unpublished appendix, and have been found to lack merit.
The defendant asserts his death sentence is excessive because, in his view, "this case is the type that may deserve the death penalty, but Antoine Tate is not the kind of offender that deserves the most maximum of all penalties." Specifically, the defendant argues that his role in the crimes was not strong and that the State's case was based almost exclusively on the contradictory and self-serving testimony of his three accomplices. However, as discussed in detail above, the State presented sufficient evidence to establish not only that the defendant was present during the commission of the murders, but also that he took an active role, firing an SKS assault rifle at the victims numerous times.
The defendant also argues that he had never before been in trouble and had no violent history. However, these allegations are contrary to information contained in the CSI and the UCSR. Not only did the defendant have a juvenile criminal record, but he also had two felony convictions, and eleven felony arrests, before his commission of the instant crime.
The defendant further contends his sentence of death is disproportionate because he is the only one of the perpetrators to receive the death penalty. According to the defendant, Leonard Toney pleaded guilty to manslaughter, Derrick Jackson pleaded guilty to first degree murder and received a sentence of life imprisonment at hard labor, and Timothy Gross and Samuel Williams each pleaded guilty to accessory after the fact and received only four-year sentences. However, as a general rule, the fact that a co-defendant has received a more lenient sentence does not necessarily indicate that the penalty imposed on the defendant is excessive. State v. Day, 414 So.2d 349, 352 (La.1982). In the instant case, the State relied on the testimony of three co-perpetrators who testified that the defendant fired the SKS assault rifle at the vehicle in which the victims were killed. In addition, the surviving victim identified the defendant by voice and the blood of one of the deceased victims was found on the defendant's shoe. Consequently, the defendant's role in the crime was hardly minor, nor was the evidence against him insubstantial. Thus, the defendant's sentence is not disproportionate or arbitrary under *941 these circumstances. See State v. Chester, 97-2790, p. 23, 724 So.2d at 1289 (death sentence imposed in first degree murder case not disproportionate on ground that co-defendant, who was tried and convicted of second degree murder after defendant, was given life sentence; state contended that co-defendant was a principal and that defendant was shooter, and jury found that evidence supported this conclusion).
Finally, we turn to the defendant's claims that his sentence of death is excessive, because he is mentally retarded, and, alternatively, that his case should be remanded for a hearing under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), to determine whether he is in fact mentally retarded. Before oral arguments were heard in this case, the United States Supreme Court issued an opinion in Atkins prohibiting the execution of mentally retarded persons. In his supplemental brief, the defendant argues that, under Atkins, he cannot be executed because he is mentally retarded. Pointing out that neither he nor the State had the benefit of Atkins at the time of the penalty phase, he argues that there is sufficient indication of mental retardation in the record to entitle him to a remand of the matter, as was done in State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835, and State v. Dunn, 01-1635 (La.1/11/02), 831 So.2d 862.
In Williams, we provided guidelines to the trial courts in post-Atkins hearings:
1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has "reasonable ground" to believe a defendant is mentally retarded, LSA-C.Cr.P. art. 643; 2) to hold the hearing before a judge, not a jury; and 3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-[R.S.] 28:381.
Id., 01-1650, pp. 32-33, 831 So.2d at 861. Furthermore, we determined that the defendant in Williams was entitled to a post-conviction evidentiary hearing on the issue of his mental retardation based on the following facts:
In sum, this defendant is an individual who: 1) was 16 years of age at the time of the murder, still within the "developmental stage" by any definition of that term; 2) will not be 22 years of age until 2003, still within the development stage by Louisiana's statutory definition; 3) has an IQ within the range used in the diagnosis of mental retardation; 4) suffered from lead poisoning as an infant and had numerous mental health commitments prior to the age of 15; 5) was enrolled in "special ed" classes; and 6) has not had the issue of mental retardation put before the fact finder in light of the Atkins restriction on the death penalty. Thus, this court concludes the defendant is entitled to an evidentiary hearing which will give him an opportunity to prove he is mentally retarded pursuant to the definitions of LSA-R.S. 28:381, and, under Atkins, not subject to the death penalty.
Id., p. 28, 831 So.2d at 857 (footnote omitted).
Similarly, in Dunn, we stated:
It would be patently unjust to conclude from this record that the defendant failed to prove a fact which the defense was not called upon to prove at the time of the trial. Because the burden of proof of establishing mental retardation is imposed on the defendant, the defendant must be afforded the opportunity to meet that burden in a case such as this in which an expert testified without contradiction Dunn is mentally retarded and his IQ is very close to that which *942 would indicate mental retardation. We reiterate that a defendant is not entitled to a post-Atkins hearing regarding mental retardation merely upon request.
... Because the record contains sufficient evidence in the form of Dr. Zimmerman's uncontradicted expert opinion [that Dunn was mentally retarded], there exists reasonable ground to doubt whether defendant is mentally retarded [and this court must] remand for a hearing on the issue of whether or not Dunn is in fact mentally retarded.
Dunn, 01-1635, pp. 29-31, 831 So.2d at 886-87.
In the instant case, Dr. Thomas Merrill, a clinical psychologist, testified as an expert witness for the defense. While Dr. Merrill did testify that the defendant has borderline intellectual functioning with a full scale IQ of 75, he also stated that under Louisiana's definition of mental retardation the defendant is not mentally retarded: "By definition, mentally retarded, in this state requires an intellectual functioning at this level, but also requires that you are unable to perform your daily tasks of living. So by definition in this state, he doesn't fit that picture." Dr. Merrill also testified that, although the defendant did not do well in school, he functions on a seventh or eighth grade achievement level.
Based on this testimony, we do not find that the record contains sufficient evidence to establish reasonable grounds that the defendant may be mentally retarded, such that the case must be remanded pursuant to Williams and Dunn for a post-Atkins hearing to determine mental retardation. For the same reason, we do not find that the defendant's sentence is unconstitutionally excessive based on a claim of mental retardation as supported by the present record.

Aggravating Circumstances
The defendant was indicted for first degree murder on the basis that the killing was committed during the perpetration or attempted perpetration of an armed robbery or assault by drive-by shooting, and that the offender knowingly created a risk of death or great bodily harm to more than one person. La.Rev. Stat. 14:30.1(A). In seeking the death sentence against the defendant, the State relied on, not only these two aggravating circumstances, but also that the offense was committed in an especially heinous, atrocious, or cruel manner. La.Code Crim. Proc. arts. 905.4(A)(1), (4), and (7). As discussed above, although the evidence did not support the latter aggravating circumstance, the State presented sufficient evidence to support the jury's finding of the other two aggravating circumstances.

Proportionality Review
Although the federal constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
The State's Uniform Capital Sentence Review Memorandum (UCSRM) reveals that jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have since 1976 recommended imposition of the death penalty on approximately twenty-four occasions, including the current case. Several of the *943 salient features of the instant case are sufficiently similar to the circumstances of other capital cases resulting in death sentences recommended by juries in the 19th JDC to indicate that this defendant's sentence is not disproportionate to the offense committed. For example, this court has previously affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery. See, e.g., State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Broadway, 96-2659 (La. 10/19/99), 753 So.2d 801; State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660; State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364; State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326; State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865.
A comparison of the defendant's case, in which three men were killed and another seriously injured, with these cases indicates that the death penalty as applied to Antoine Tate is not disproportionate considering this offender and the offense.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) the Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev. Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[1] The unpublished appendix, which is attached to this opinion and is made part of the official record in the case, contains our discussion of those assignments of error not treated in this opinion.
[2] While the trial court did not give the jury defendant's requested special instruction on accomplice testimony, the general jury instructions adequately cautioned the jury about such testimony. See discussion, infra, pp. 937-38.
[3] Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation while armed with a dangerous weapon." La.Rev.Stat. 14:64.
[4] Assault by drive-by shooting is defined as "an assault committed with a firearm when an offender uses a motor vehicle to facilitate the assault." La.Rev.Stat. 14:37.1
[5] Prospective juror Michael Walls is discussed in the unpublished appendix.
[6] The defendant's contention that the district court erred in denying cause challenges of prospective jurors Judith LeBlanc and Gary Zachary are discussed in the unpublished appendix.