MOORE, J.
1!A jury found the defendant, Antrown McGarr, guilty as charged of aggravated second degree battery, a violation of La. R.S. 14:34.7, and possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. McGarr filed several post-trial motions which were denied by the trial court; however, the court failed to rule on McGarr’s motion for new trial. It subsequently sentenced the defendant to serve ten years imprisonment at hard labor for the battery conviction and fifteen years at hard labor without parole for the firearm conviction; the court imposed five years of the battery sentence consecutively with the firearm sentence.
The defendant appealed. The record on appeal was lodged and the matter docketed as No. 47,049-KA. Upon error patent review, we noticed the trial court’s failure to rule on defendant’s pro se motion for a new trial. In an unpublished opinion, we vacated McGarr’s sentences and remanded for disposition of the motion for new trial. The trial court denied the motion for new trial and resenteneed McGarr to the same sentences originally imposed. McGarr now appeals for the second time. For the following reasons, we affirm.
The charges against the defendant arose from an incident in Rayville, Louisiana, on June 5, 2009, in which a man, Quincey Hampton, was shot. Hampton, age 25, was a resident of Monroe. He was dating Latonya Giles, who is a resident of Ray-ville and the former girlfriend of the defendant. The defendant and Ms. Giles had a child together.
*238 When Giles and McGarr separated, Giles kept the customized, pink Chevrolet Caprice Classic with chrome wheels. Giles allowed her new |2boyfriend, Hampton, to use the vehicle, much to the displeasure of the defendant. Hampton testified that he and McGarr had a confrontation in Giles’ yard regarding the car, and McGarr told Hampton that “he don’t want me drivin’ that car. And if he seen me drivin’ that car, he was gonna shoot it up.”
Another incident involving the two men occurred in Rayville in front of an apartment complex. Hampton testified that he was leaving the complex when he saw “Loco” (McGarr’s street moniker) drive up and stop his car in front of the pink Caprice. Hampton said that the defendant got out of his car wielding a baseball bat. Hampton “hit the gas” to drive around the defendant, but as he drove away, the defendant knocked off the driver’s side door mirror.
Describing the shooting incident on June 5, 2009, Hampton testified:
I was uh — I was in the Caprices Classic, on my way goin’ to uh, the Richland Apartments, on that time and date. Uh, as I was drivin’, I’m drivin’ with my left hand on the steerin’ wheel and I seen Antonio McGarr. He wuz walkin’ down the street. But I really didn’t know it was him, until, you know, he raised his head up and then he starts — he starts shootin’ at the car. He starts shootin’ at the car. “Doon doon doon doon” and then he had shot me, you know what I’m sayin’? When he shot me, I had felt the pain in my right — my right arm and hip. And I dropped my lef hand and fell— fell by hip [sic ] and I grabbed the steering wheel with my right and I was loo-kin’ at the blood and I was sayin’ in the car to myself, man I’m hit — I’m hit. And I just pushed the gas and drove all the way home.
This shooting incident occurred at the intersection of Dr. Martin Luther King Drive and Ollie Street.
Hampton said that there was no one with the defendant at the time of the shooting. He did not see a Ms. Sequoia Sledge, a resident of the area who later became involved in the investigation. Hampton was able to drive away to Giles’ house, where Giles called for an ambulance. Paramedic Cynthia Ott reported that Hampton told her that he had been shot through the passenger |3door of his car. Hampton was later treated at Glen-wood Hospital by Dr. Melissa Traxler for his gunshot wound, which was close to his femoral artery. The bullet entered the front of his right thigh and exited the back of his right thigh.
In the meantime, police responded to the scene of the shooting. The shooter had fled the scene. Hampton was also gone, but police met with Ms. Sledge, who said that she was a witness. Based upon what Ms. Sledge told police, they searched an area about 150 yards away from where the event actually happened and found no evidence. However, later that evening, one of the officers, Tamario Turner, spoke with his Aunt Tina, who lived nearby. Tina Turner saw the shooting and was able to accurately direct officers to the scene. After Hampton was treated at the hospital, he was released late that night and went with Officer Turner to the site of the shooting. Turner searched the area and found two spent 9 mm cartridge cases. No firearm was ever recovered.
During the investigation, close examination was made of the bullet hole in the hood. At the preliminary hearing, Officer Turner said, “We took a rod, lengthy rod, and stuck it through the hood of a vehicle, in which it went through the dashboard going directly towards the driver’s side of the vehicle.” However, at trial, Turner *239 admitted that another officer had done this testing, and it was established that the bullet that went into the hood of the car was not the bullet that hit the victim.
Another witness to the shooting, Paul Landrum, told the jury what he saw. He was standing in a carport on Dacron Street, a street that intersects Ollie Street; he testified:
I seen the defendant walking towards MLK, and I seen the |4... pink car cornin’ by this time. I like — I seen like he was reachin’ for somethin’. By this time, I seen the defendant like bending down and I heard a shot — pow. And then I heard another shot — pow. And one went one way and the other one went the other way.
The defendant had his back turned to Landrum. Landrum said that he did not see a gun in the defendant’s hand, but said, “I seen him extend his arm.” He agreed with the prosecutor that this gesture was “like he had a gun in [his hand].” After the shooting, Landrum did not see the defendant; he got in his car to follow the pink car “to see was he hurt” because he thought the defendant had shot the driver.
Notably, Landrum had previously spoken with Rayville police about the incident, and the officer’s report about that statement indicates that Landrum said “Loco come up with his right hand, he had a gun, and pointed it at the car.” Landrum said that he did not recall telling the officer that he saw the defendant with a gun, but said that he was on supervised release for a felony conviction and that the officer reminded him of that during their conversation.
Tina Turner, Officer Turner’s aunt, also testified. Her house is on Ollie Street. On the day of the shooting, she was standing under a tree in her front yard when she saw the defendant walking by her house toward MLK drive. She said that the defendant stopped and talked to her daughter, but she (Tina) did not speak with him. After speaking with Ms. Turner’s daughter, the defendant continued walking toward MLK. Tina said that she then heard shots fired, and stated: “I seen the guy pass by the house and when he passed by he was just looking over there.” “He had a smirk look on his face.” “And I just seen Loco running.” She said that she didn’t know whether the look reflected that he was in pain.
| r;Ms. Turner heard another person in her yard, Ms. Kim Elmore, scream: “Loco, you motherfucker!” “Sheee, you done lost your fuckin’ mind, shootin’ over my fuckin’ kids.” Ms. Turner did not see where the defendant ran after the shooting, nor did she see Sequoia Sledge.
Likewise, Tyrhonda Turner, Tina Turner’s daughter, did not see Sequoia Sledge at any time during the shooting incident when she talked to the defendant as he walked by her mother’s Ollie Street house. After the defendant left, Tyrhonda saw the defendant speaking with Kim Elmore. She turned away for a few minutes and then heard two or three gunshots. She ran to Kim’s house to get her children. As she did, she saw the defendant running away. Then she saw Hampton drive by, leaning on the steering wheel with a look of pain on his face. She heard Kim El-more screaming: “Loco, you wrong for that motherfucker shit, shootin’ over my kids. I’m gonna call the police.”.
Several photos of the pink Caprice were placed in evidence showing a single bullet hole in the hood near the passenger’s side of the windshield, which lodged in the ear’s firewall, and a blood stain on the front seat on the driver’s side of the car. The jury also saw a photo of Hampton’s shorts and underwear; there is a hole in the shorts *240 that Hampton described as a bullet hole and a quantity of blood on the underwear.
Finally, the state elicited testimony from Kevin Greer, a Louisiana Probation and Parole officer, who testified (with supporting exhibits) that he had supervised the defendant after his release from custody after convictions in 2003 for second degree battery and distribution of cocaine.
When trial commenced the next day, the defendant (who was out on 16bond) did not appear. After a failed attempt to contact the defendant, the court found that he had voluntarily absented himself from the proceedings.
The defendant’s first witness, Kim El-more, testified that on June 5, 2009, she was at her sister’s house at the intersection of Dacron and Ollie Streets. She said that she did not see the defendant that day, did not see him with a gun in his hand and did not yell out to him about shooting over the children. She also said that she did not hear any gunshots and did not remember the police coming to investigate a shooting.
Investigator Gary Gilley with the Rich-land Parish Sheriffs Office testified that he was one of the officers who responded to the shooting call once Hampton reached his girlfriend’s house. He saw Hampton’s car and noticed that it had a bullet hole in the hood. Gilley took a wooden stick and put it in the hole; he discovered that the bullet that made the hole in the hood did not penetrate the car’s firewall. Gilley also said that he looked in the car and did not find a gun, any bullets, or any spent shell casings inside the car, nor was there any evidence that a shot had been fired from inside the car to the outside.
The jury convicted the defendant as charged of aggravated second degree battery and possession of a firearm by a convicted felon. As noted above, the defendant filed a variety of post-trial motions, most of which the trial court denied prior to sentencing, but one motion for new trial remained undecided, so in McGarr’s first appeal, this court vacated his sentence and remanded the case to the trial court for a decision on the outstanding motion and for resentencing. The trial court denied the outstanding motion for new trial. Subsequently, the trial court sentenced McGarr to serve ten years at hard labor for aggravated second degree battery and fifteen years at hard labor, without parole, for |7possession of a firearm by a convicted felon, plus a fine of $1,000. The court imposed five years of the battery sentence consecutively with the firearm sentence. The court denied the defendant’s verbal motion to reconsider sentence, and the defendant filed this appeal raising two assignments of error challenging the sufficiency of evidence for each conviction.
DISCUSSION
Each assignment of error raised by the defendant alleges that the evidence was insufficient to convict the defendant for the respective crimes of aggravated second degree battery and possession of a firearm by a convicted felon. The defendant argues these assignments of error together, pointing out various alleged weaknesses in the state’s case. He urges that no witness saw him with a gun, including the victim, who offered no description of the firearm used to shoot him. Further, he argues that Hampton’s testimony irreconcilably conflicts with the physical evidence, including the theory initially advanced by Officer Turner that the wounding shot went through the car’s hood, through the firewall and into the victim.
La. R.S. 14:34.7 provides, in part:
*241 A. Aggravated second degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury.
La. R.S. 14:95.1 provides, in part:
A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. [¿15:541, 0r any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.
The focus of the defendant’s sufficiency arguments is the allegedly questionable credibility of the primary witnesses against him and the allegedly conflicting physical evidence.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App. 2 Cir. 8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.3/7/08), 977 So.2d 896.
*242 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, unit denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2 Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
In this case, the principal witness against the defendant was a convicted felon with a history of violence with firearms who was in a romantic relationship with the mother of the defendant’s child. Despite these issues, however, the evidence was plainly sufficient to convict the defendant of both of the charged offenses. Independent witnesses placed the defendant, and no one else, in close proximity to the victim at the time the shots were fired and the victim was wounded. Paul Landrum explained that when the victim drove by in the pink Chevy, the defendant moved “like he was reachin’ for somethin’ ” and then Landrum heard two shots. Both Tina and Tyrhonda Turner put the defendant in the immediate vicinity of the victim at the time of the shooting, and the defendant was running away after the shots were fired.
The questions regarding Officer Turner’s investigation of the case and the discrepancies in his versions of the events, as well as the various discrepancies in the testimony of the other witnesses, do not show an irreconcilable conflict with the physical evidence, particularly given the multiple witnesses whose testimony fully supports the state’s theory of the case. Hampton explained that his passenger side window was down at the time of the shooting, and since at least two shots were fired during this incident, the physical evidence supports a theory (that the jury obviously accepted) that the wounding shot entered through Hampton’s open window. The evidence plainly supports the jury’s finding that the defendant was armed with a firearm despite the absence of testimony of any eyewitness that saw a gun.
|t1In summary, viewing the evidence in the light most favorable to the state, the evidence proves beyond a reasonable doubt all of the elements of the offenses of conviction. These assignments of error are without merit.
CONCLUSION
For the above reasons, the defendant’s convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.