SEXTON, Judge Pro Tem.
|, Defendant Herbert James Bradley was convicted by a jury of the second degree murder of his wife, Sallie[1] Scott Bradley, and was sentenced to life imprisonment at hard labor without parole. He now appeals. For the reasons stated herein, the conviction and sentence of Defendant are affirmed.

FACTS

Defendant’s jury trial took place in April 2011, where the following evidence was adduced. Defendant and his wife, Sallie, lived in a house on South 7th Street in Monroe, Louisiana. Between them, they had several children (mostly adults) and grandchildren. The couple had been having marital problems[2]; and, on the evening of December 31, 2009, Sallie drove to her mother’s home in Monroe. Sallie brought two bags of clothes with her and told her mother, Almeda Caesar, that she was tired of her husband “always accusing her of having sex with another man.” According to her mother, after Sallie unloaded her clothes at her mother’s house, she received a phone call from Defendant. In response to the phone call, Sallie decided to return to the marital home, saying she was “going to go back one more time to try to make it work.” Sallie then drove home and called her mother to let her know that she arrived home.
At about 8:30 p.m., two of Defendant’s daughters, Zavier Harris and L’Maryyan Bradley, stopped by the Bradleys’ house to borrow some money. |gZavier testified that she did not see her father and Sallie arguing or fighting, although she was aware that they had been separated on occasion in the past. The daughters left the Bradleys’ home and went out to a club.
At the house next door to the Bradleys, Afrika Howard was sitting with an elderly person. Ms. Howard heard what she thought were firecrackers outside and then she heard a knock at the door. When she looked outside, she saw no one there, but she saw a red truck driving away. She believed that this truck (a red GMC Yukon) was the truck she had often seen parked at the Bradleys’ house, and it belonged to Defendant.
Before dawn on January I, 2010, Jerome Manning, a good friend of Defendant, was driving down South 7th Street. Mr. Manning was on his way to work and in the area to check on his elderly mother. As he drove by the Bradleys’ house, he saw a person lying partly in the street in front of the home. The person was Sallie Bradley. She was still alive, but was unable to speak. A neighbor called 911 and paramedics and police responded just before 4:30 a.m.[3]
Sallie had suffered five gunshot wounds to her upper body (three of which were in her back), and she died as a result of these wounds before she was able to make a *649 statement. A responding Monroe police officer, Corporal Greg Bauer, found a blood trail leading from where Sallie lay in the grass up to the Bradleys’ front door. Officers searched the home, but found no one inside; the doors were all locked except for the front door and the windows were protected by burglar bars. Police found blood spatters on | sthe front door glass and just inside the front doorway. Officers also found spent bullets in several locations and a bullet fragment near the door. There were no signs of forced entry, and a woman’s purse containing $500 in cash was still in the house.
At about 4:00 or 4:30 a.m., L’Maryyan received a call on her cell phone from her mother, Deborah Harris. Ms. Harris asked L’Maryyan and Zaveir to come to Ms. Harris’ house on Gordon Avenue. The women drove from the club to Ms. Harris’ home.
When L’Maryyan and Zaveir arrived at Ms. Harris’ house, they observed Defendant standing outside the house, but did not see his red GMC Yukon parked in the driveway. Zaveir went inside to check on her two-year-old daughter; and, when she found nothing Wrong, she came back outside to speak with her father. Defendant told L’Maryyan, ‘Your daddy’s in trouble,” and then asked his daughters to take him to his aunt’s, Ora Bradley’s, house. Defendant told his daughters that his vehicle was parked in Zaveir’s front yard approximately four blocks away, but he would not explain why. During the drive, L’Ma-ryyan drove past Mr. Manning’s house and Defendant asked L’Maryyan to look and see if Mr. Manning was at home, but she saw that he was not there. She called Mr. Manning, who told her not to come by her father’s house and that “he [Manning] had everything under control.”
When they dropped off Defendant at Ora Bradley’s house, L’Maryyan and Za-veir went to get their older sister, Sherbert Bradley, to find out why 14their father was behaving so strangely. The three then returned to Ora Bradley’s house.
There, Defendant was making phone calls in an effort to arrange to go to Texas. Zaveir testified that Defendant related that he “needed to lay low for a couple of days.” L’Maryyan testified that Defendant said “he needs to get out of town.” Sherbert testified that Defendant stated “that he was in trouble and he needed to get out of town.” At that time, the daughters did not know that anything had happened to Sallie and none of the daughters had ever seen their father with a firearm.
The daughters agreed that Defendant first called their aunt Pam in Mesquite, Texas, and then he called his son, Jaworski Underwood, in Arlington, Texas. Sherbert’s boyfriend, Lucky, eventually agreed to drive Defendant to Texas accompanied by Sherbert, L’Maryyan and Zaveir. During the drive, Defendant did not talk; however, L’Maryyan received a phone call from “Neka” (Shaniqua Caesar), Sallie Bradley’s daughter, who told L’Maryyan, ‘Your dad killed my mama.” When L’Ma-ryyan said this out loud in the car, Defendant shook his head indicating “no.”
The group, including Defendant, traveled to Kaufman County, Texas, where Jaworski was waiting to pick up his father. Jaworski had agreed to pick up Defendant and take him back to Arlington, but Defendant had not, at that point, explained why he needed to stay in Texas. Jaworski testified that, after they arrived in-Arlington, people began to call and inquire about his father, so Jaworski confronted Defendant. Jaworski related that “He [Defendant] said that she [Sallie] died, that he killed her.... He said he shot | sher.... [A]bout three times ... in the back and shoulder....” Jaworski further testified that he then called the Monroe, Louisiana, *650 and Arlington, Texas, police, and the Arlington police came to Jaworski’s residence and arrested Defendant.
When news of the killing spread, Sallie’s brother, Dennis Caesar, who was incarcerated at the time, related to police that Defendant owned a .38 caliber handgun which he had seen while moving some furniture into the Bradleys’ house. Police searched Defendant’s SUV, but did not find a firearm inside. The murder weapon was not recovered.
Several days later, after Defendant was returned to Louisiana from Texas, Detective James Willis interviewed Defendant. After the detective introduced himself and informed Defendant that he was investigating the murder of his wife, Defendant began crying and spontaneously told the detective that “he could not remember anything” and that “Sallie was his heart.” Defendant did not make any further statements to police.
Defendant elected to testify at trial. He admitted that he had several felony drug convictions. He said that he normally awoke at 4:00 or 4:80 a.m. in order to cook breakfast for his wife before she left for work at 5:30 a.m. Defendant testified, however, that he had been invited out by friends to attend a New Year’s Eve party on the night Sallie was killed. Defendant stated that he went out to a club called “Eddie Gibbs” at about 1:00 a.m. on January 1, 2010. He testified that he stayed at the club playing pool until about 3:00 or 3:30 a.m. and then drove home. Defendant related that there was no unfamiliar car in the driveway when he arrived home and Ule entered his home through the gameroom door. According to Defendant, when he entered the house, he saw his wife “with two dudes holding her.” Defendant testified that one of the men said, “We’ve been waiting on you so you might as well come on in.” Defendant explained:
I just stopped. And then by that time, when I stopped, one dude had a gun, and so I started trying to ease back. And so they was steady easing forward with her. So I started trying to ease back. So by that time, when I eased back, I just — I had my cell — I got my cell phone, like I had something. And so by that time, I faked it. Then, I took out running. And then I went out the back door.
Defendant said that he then heard about three shots just as he ran into the backyard. Next, he went to his truck and drove toward his daughter’s house; he said that he did not see his wife again.
Defendant testified that he believed the incident was related to associates of his son, Jaworski. Defendant explained that Jaworski and his friends did “little things,” that he described as a pigeon drop scheme, in the Ruston area rather than in their home town. Defendant said that Jaworski claimed that he would “fix up little packages of cocaine, but it don’t be fully cocaine, you know. It would be like — it would be like the quantity of it would be real, real weak.” He further explained that “the only house that the people that they had been dealing with know was my house.” Defendant stated that, in December 2009, two men had come to his house three times demanding money as a result of one of these schemes.
Defendant testified that, after the shooting, he wanted to contact Jaworski because he attributed the events of that evening to Jaworski’s scheme and he wanted Jawor-ski to pay the men. Defendant further testified [7that, at that time, he did not know that his wife had actually been shot; he thought the shots were simply to scare him. He explained that, when he finally told Jaworski what happened, his son “started freaking out” and asking whether anyone had followed him. Defendant stat *651 ed that he intended for Jaworski to bring him back to Monroe the next day so Ja-worski could pay the men he had cheated; but, instead, Jaworski had Defendant arrested. Defendant denied ever having a gun (he was a convicted felon) and denied that he ever wanted to kill his wife. He also denied the various accusations that she had written on the counseling form and he denied that he called Mr. Manning on the morning of the shooting. Defendant admitted that, while at Ora Bradley’s house, he called Pam in Mesquite before he called Jaworski, but he testified that he could not recall why he had called Pam.
Trakeka Charleston, a dancer, testified that she had known Jaworski Underwood for about four or five years. She stated that, when Jaworski was in Monroe, he frequented the club where she danced. Ms. Charleston testified that Jaworski was in town the third week in December 2009 because she saw him at the club.
Jaworski denied that he had been in Monroe in December 2009 and said that he had not been there for six or seven months. Although he had a 2009 conviction in Texas for possession of marijuana and admitted that he had “associates— people who I know that deal with it,” Jaworski denied any more serious drug convictions or dealing drugs. Jaworski testified that, in October 2009, he introduced his father to his associates because his father wanted to buy a pound of marijuana.
|sThe last witness to testify was John Wilson, Zaveir’s husband. Mr. Wilson testified that, in January 2010, after the shooting, Mr. Manning brought $500 to Zaveir to “give it to her daddy,” and that Mr. Manning told Zaveir:
That the police doesn’t [sic] have any evidence, that he took care of the gun situation, don’t worry about anything, and he going to take care of everything.
Mr. Manning denied that he made any such statement about a gun.
After hearing the above evidence, the jury unanimously found Defendant guilty as charged. As previously stated, the court imposed the mandatory life without parole sentence and Defendant now appeals. Defendant appears through counsel urging one assignment of error and asserts additional errors pro se. The assignment urged by counsel for Defendant challenges the sufficiency of the evidence and will be addressed first.

DISCUSSION

Assignment of Error No. 1. The State failed to present sufficient evidence to support the verdict of second degree murder.
With an extremely careful and detailed recitation of the facts as presented by the witnesses’ testimony, Defendant’s counseled brief argues that the evidence was insufficient to convict Defendant of second degree murder. He argues:
—that there was no prior evidence of violence or physical abuse by the defendant toward his wife;
—that Jaworski Underwood was a drug dealer who cheated people who knew only the address where the victim was killed, and that the defendant’s testimony was consistent with that allegation; and
la — that the proof was scant that the defendant owned a gun.
Defendant highlights the arguable weaknesses in the State’s case; however, we find the evidence to be sufficient to prove beyond a reasonable doubt that Defendant committed the second degree murder of his wife.
La. R.S. 14:30.1 provides, in part:
A. Second degree murder is the killing of a human being:
*652 (1) When the offender has a specific intent to kill or to inflict great bodily harm[-]
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42, 894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.U/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 | in(La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Durden, 36,842 (La. App.2d Cir.4/09/03), 842 So.2d 1244, writ denied, 03-1350 (La.11/26/03), 860 So.2d 1131. Likewise, fabrication is evidence of consciousness of guilt. State v. King, 41,-084 (La.App.2d Cir.6/30/06), 935 So.2d 815, writ denied, 06-1803 (La.2/16/07), 949 So.2d 411.
The jury plainly chose to credit the testimony of the State’s witnesses, in particular the testimony of Jaworski Underwood. A review of the above-described testimony reveals that to be a rational choice. Defendant fled from the scene immediately after the shooting and, rather than summon the police, he called his friend, his relatives and his children in a hasty effort to “get out of town,” where he finally admitted to his son that he killed Sallie. We find this evidence sufficient to prove beyond a reasonable doubt that Defendant committed the second degree murder of his wife. This assignment of error is without merit.

.Pro se Assignments of Error (verbatim):

1. Whether the State’s assistant district attorneys were in violation of defendant’s 5th and 14th amendment rights to the U.S.C.A. when [sic ] it didn’t inform the jury that it would be granting the witnesses immunity to testify against the defendant during trial.
2. Whether it was a violation of defendant’s 5th, 6th and 14th amendment rights, and his La. Const. Rights of 1974, Article 1, §§ 2 and 16, when the State’s A.D.A. | T1knowingly knew it was required to inform the jury that the state was granting its witnesses immunity, but failed to do so, has caused a violation of Brady.
3. Whether the State’s A.D.A. knowingly knew it violated the petitioner’s rights to have these witnesses privilege against self-incrimination to testify or produce evidence, without the jury knowing they would be granted immunity in exchange for their testimony.
*653 4. Whether the State’s A.D.A. who tried the case, violated the defendant’s La. Const, rights Art. 1, §§ 2 and 16 and the U.S. Const. Amend. 5, 6 and 14, when the police made promises for the witnesses to make statements prior to trial against the defendant by stating he promise nothing would happen to her if yes [sic] made the statement to him through interrogation without the jury knowing about the promise he made to her.
With these assignments of error, Defendant alleges that his rights were violated when the jury was not informed that witnesses L’Maryyan Bradley, Sherbert Bradley and Zaveir Harris were each the subject of a separate order, pursuant to La. C. Cr. P. art. 489.1, as follows:
It is hereby ordered that [witness] fully and truthfully cooperate and provide trial testimony in all proceedings pursuant to a grant of immunity under Louisiana Code of Criminal Procedure article 439.1 as requested by the State of Louisiana in the aforementioned prosecution.
It is further ordered that no testimony or other information compelled under this order, or any information directly or indirectly derived from such testimony or other information, may be used against this witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with this order.
Further, Defendant argues that the jury should have been informed that Sherbert had been promised by police, at an interview on January 15, 2010, that she would not be “locked up” for making a statement. He argues |12that the jury should have been aware that the witnesses had been granted immunity from prosecution “in exchange for” their statements.
La. C. Cr. P. art. 439.1 provides:
A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be *654 adjudged in contempt of court and punished as provided by law.
The Constitution of the United States requires that the State produce exculpatory evidence upon the request of a defendant. Brady v. Maryland, 373 U.S. 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This includes evidence, such as a grant of immunity, which may cast serious doubt upon the testimony of a witness whose credibility may be determinative of guilt. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
Defendant’s arguments assume that the district attorney somehow hid from him, or the jury, the fact that these witnesses were granted immunity from prosecution for their testimony. However, as the orders themselves demonstrate, the orders compelling testimony and granting immunity were filed prior to trial, are part of the record of the ease and, thus, were known to Defendant prior to trial. Defendant could have chosen, on cross-examination, to explore the effect, if any, that these orders had upon the witnesses’ credibility. We find nothing to have been hidden or withheld by the State.
These pro se assignments of error are without merit.

CONCLUSION

For the foregoing reasons, the conviction and sentence of Herbert James Bradley are affirmed.
AFFIRMED.

. Also spelled "Sally” in the record.

. The State introduced into evidence a form completed by Ms. Bradley during counseling where she outlined her disagreements with Defendant. On this form, entitled "Setting Boundaries,” the victim wrote that she did not want to be awakened "for sex when I have to work,” that "it hurts my feelings for you to think I’m cheating” and that she would prefer not to "be thought of as a whore.”

.Phone records show that Defendant called Mr. Manning at 4:22 a.m. and 4:36 a.m. Mr. Manning denied that he spoke with Defendant.