Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,746-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

RICHARD REFUND SPENCER                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 397,087

Honorable Michael A. Pitman, Judge

* * * * *

LOUISIANA APPEALS AND                  Counsel for Appellant
WRIT SERVICE
By:  Remy V. Starns
     Michael A. Mitchell
     Desiree M. Valenti

RICHARD REFUND SPENCER                      Pro Se

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

WILLIAM J. EDWARDS
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and ROBINSON, JJ.

**THOMPSON, J.**

A domestic dispute escalated to murder when Richard Refund Spencer ("Spencer") shot his on-again, off-again girlfriend seven times, two of which were from above as she lay on the floor. Spencer fled the scene in the victim's vehicle, leaving her for dead. An investigation by the Shreveport Police Department quickly identified Spencer as a suspect, and a search of the vehicle in which he fled led to the recovery of the firearm confirmed to be the one he used during the shooting. During his interrogation, Spencer admitted to shooting the victim, but claimed he did so in response to provocation, and that the killing was committed in sudden heat of passion or blood. After a two-day trial, a unanimous jury found Spencer guilty of second degree murder. Spencer now appeals his conviction and mandatory life sentence, arguing that the mitigating factors of manslaughter were shown by a preponderance of the evidence. For the reasons set forth below, we affirm Spencer's conviction of second degree murder and his mandatory life sentence without benefit of probation, parole, or suspension of sentence.

## PROCEDURAL HISTORY

This matter has returned to this court from a prior appeal, *State v. Spencer*, 56,357 (La. App. 2 Cir. 3/26/25), which addressed the issue of the trial court's failure to rule on Spencer's motion for post verdict judgment of acquittal. Spencer was indicted[1] for one count of second degree murder, in violation of La. R.S. 14:30(A)(1). After an evidentiary hearing establishing Spencer's statements were free and voluntary, a two-day jury trial[2]

---

[1] December 14, 2023
[2] July 23-24, 2024

commenced and concluded with a unanimous jury finding him guilty as charged. Spencer filed a motion for post verdict judgment of acquittal,[3] challenging the sufficiency of the evidence. Without ruling on Spencer's motion, the trial judge sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence.[4] Spencer filed a motion to reconsider sentence, which was denied.[5] Spencer challenged the failure of the trial court to rule on the pending motion for post verdict judgment of acquittal, seeking review by this court.

In our earlier per curiam opinion,[6] this Court vacated Spencer's original sentence and remanded the matter to the trial court for further proceedings, citing the absence from the record a ruling by the trial court on Spencer's pending motion. At a subsequent hearing[7], the trial court denied the pending motion for post verdict judgment of acquittal and again sentenced Spencer to life imprisonment without benefit of probation, parole, or suspension of sentence. Spencer now seeks review by this court of his sentence.

---

[3] July 30, 2024.
[4] August 1, 2024.
[5] August 14, 2024.
[6] PER CURIAM. This appeal arises from the defendant's conviction and sentence for second-degree murder. Defendant's appellate counsel has filed a "Motion to Vacate and to Set Aside Sentence and To Remand," requesting that the sentence be vacated and set aside and remanded for further proceedings. A review of the appellate record reveals that the trial court failed to rule on the defendant's motion for post-verdict judgment of acquittal prior to sentencing the defendant, in accordance with La. C. Cr. P. art. 821. Accordingly, the motion is granted, and defendant's sentence is hereby vacated, the appeal is dismissed, and the matter is remanded to the trial court for further proceedings. The defendant may then appeal including any adverse rulings or any sentence subsequently imposed. *State v. Whitaker*, 51,632 (La. App. 2 Cir. 5/25/17), 225 So. 3d 524; *State v. Jackson*, 614 So. 2d 783 (La. App. 2 Cir. 1993).
[7] May 27, 2025.

## FACTS

Prior to the shooting, Richard Spencer and Michelle Wells had been in an on-again, off-again romantic relationship for approximately 5 years, with Spencer living with Wells in her home for approximately 2 years. On August 16, 2023, the Shreveport Police Department ("SPD") responded to a shots-fired call at Wells' home, 3601 Dallas Street in Shreveport, Louisiana. Upon arrival, officers observed a female, later identified as Wells, suffering from multiple gunshot wounds, and officers immediately began rendering aid. Wells was transported to Ochsner LSU Medical Center, where she later died from her injuries. Spencer was identified by eyewitnesses as the suspect in Wells' shooting, was later arrested and charged, and the matter eventually proceeded to trial.

At trial, Gregory Wells ("Gregory"), the brother of the victim, testified he was present at the residence the night before the shooting.[8] He arrived at his sister's home that evening around 7:00 PM. Gregory testified that Wells and Spencer were arguing that night, and she wanted him to leave the house. Wells stated they were arguing about money and Spencer's personal hygiene. The argument occurred outside in a gazebo behind the garage area of the home where Gregory could hear their conversation. Spencer responded, "over his dead body," to Wells' request for him to leave her residence. Gregory testified he had seen Spencer driving his sister's black Mazda sedan and had also previously seen Spencer with a gun. Gregory testified that Wells, fearing for her safety, had asked him to return to her home the next day, "because she felt like [Spencer] was going to do

---

[8] August 15, 2023.

something."  Gregory was not present in the home at the time of the shooting.

Ladatreon Fuller ("Fuller") testified that he is the great-nephew of Wells.  Fuller testified he had been staying in the storage shed on the property, which he referred to as the "man cave," just outside of Wells' home.  Fuller was in the shed on the date of the shooting.[9]  Fuller testified that he was listening to music in the shed when he observed Wells' young granddaughter exit the home screaming.  Wells' granddaughter alerted Fuller that Spencer "shot my grandma."  Fuller testified that the child appeared traumatized.  Fuller walked toward the residence and observed Spencer drive away in Wells' black Mazda sedan.  Fuller entered the main house and saw Wells lying injured on the floor by the refrigerator.

Destiny Flowers ("Flowers") testified she is a carrier for the United States Postal Service and was working her mail route along Dallas Street at the time of the shooting.  Flowers testified that she heard screaming from the direction of Wells' residence.  Flowers observed a young girl standing outside the garage, crying loudly.  Flowers entered the house and observed an older woman lying on the floor behind a deep freezer in the kitchen.  Flowers testified she observed a lot of blood, and Wells appeared to have at least one gunshot wound.  Flowers, who is a former member of the armed forces, asked Fuller to assist her in moving a deep freezer so she could render aid to Wells.  Flowers testified she administered CPR on Wells until police arrived and relieved her in rendering aid to Wells.

---

[9] August 16, 2023.

4

Corporal Troy Mayweather ("Cpl. Mayweather") with the Shreveport Police Department ("SPD") testified that he responded to a shots-fired call from a neighbor at 3061 Dallas Street on the day of the shooting. Cpl. Mayweather arrived on the scene and took over performing CPR on Wells. Cpl. Mayweather's body camera footage from the incident was entered into evidence. Cpl. Mayweather testified that Wells was transported to Oschner LSU Medical Center, where she was pronounced dead.

Corporal Cody Walsworth ("Cpl. Walsworth") with SPD testified that he was the crime scene investigator who documented and processed the evidence in this case. Cpl. Walsworth testified that upon arrival at the scene, he observed suspected projectile defects in the wall and door of the home. Cpl. Walsworth also observed several expended cartridge casings and projectile fragments on the floor of the home. Cpl. Walsworth testified that he discovered projectile defects and suspected blood spatter on the wall in the corner of the kitchen where Well's body was located. Cpl. Walsworth photographed Wells' living room couch, which had piles of men's clothing on it, totes full of men's clothing on the floor, and shoe boxes and men's shoes nearby. Cpl. Walsworth also photographed the kitchen where Wells' body was located. Cpl. Walsworth recovered six .380 caliber automatic expended cartridge casings and two projectile fragments from Wells' residence.

Detective James LeClare ("Det. LeClare") with SPD testified that he also responded to the shots-fired call. After speaking with eyewitnesses and other officers on the scene, Det. LeClare identified Spencer as a suspect. Det. Leclare learned that Fuller identified Spencer as the person leaving the

house in the black Mazda sedan immediately after the shooting. After those interviews, an arrest warrant was obtained for Spencer.

On August 17, 2023, Spencer turned himself in to the Webster Parish Sheriff's Office. At the time of Spencer's arrest, SPD obtained a search warrant for Wells' black Mazda sedan and seized the vehicle. A search of the vehicle yielded a firearm and two live rounds located in the chamber of the pistol and magazine.

On August 18, 2023, Det. Leclare and Detective Adam McEntee with SPD interviewed Spencer. During the recorded interview, Spencer admitted that he had been dating Wells, and they had been arguing. Spencer told detectives that he had been living at Wells' residence. Spencer admitted to shooting Wells, and that he used the firearm against her because he was getting hit with a broom and was agitated. Spencer stated that his intent was to scare Wells. Det. LeClare asked Spencer to raise his shirt to see if the alleged broom attack occurred; no injuries of any kind were observed by SPD on Spencer's body.

The trial testimony of Fuller, Flowers (the USPS mail carrier), and Cpl. Mayweather contradicts Spencer's testimony that Wells was using a broom to strike him. These individuals were inside the residence immediately after the incident and rendered aid to Wells. Their testimony was consistent in that there was no broom located anywhere near Wells' body. Additionally, the video from Cpl. Mayweather's bodycam footage of the crime scene does not show any broom near Wells' body.

SPD submitted the shell casings and recovered firearm processed by Cpl. Walsworth for DNA testing. DNA swabs were taken from the casings, the grip, and the trigger area of the recovered firearm, and a buccal swab

6

was also collected from Spencer. The North Louisiana Crime Lab performed testing and comparison of the DNA samples. The crime lab reported that Spencer was identified as a major contributor out of three other minor contributors from the grip and trigger area of the firearm recovered from the black Mazda sedan. The crime lab also performed ballistics analysis of the shell casings from the scene and the bullets found in the recovered firearm, which determined the expended bullets and recovered casings, as well as the bullets recovered from the shooting scene, were all fired from the recovered firearm.

Dr. Long Jin, a pathologist at Oschner LSU Medical Center, performed the autopsy on Wells, prepared a report of his findings, and testified at trial. Dr. Jin observed seven gunshot wounds on Wells' body, all perforating wounds that both entered and exited her body. The fatal gunshot wound, which penetrated Wells' heart, entered her upper middle chest slightly on the left and exited through her right back, indicating the bullet was fired into her from above. Spencer did not testify at his trial.

During closing arguments defense counsel argued that the evidence supported the responsive verdict of manslaughter for Spencer. The unanimous jury found him guilty as charged of second degree murder. Spencer now appeals his conviction, asserting one assignment of error, and argues that mitigating factors of manslaughter were shown by a preponderance of the evidence and that Spencer's conviction and sentence should be modified accordingly.

## DISCUSSION

**Assignment of Error No. 1:** **The evidence was insufficient to support the verdict of second degree murder; the mitigating factors of manslaughter were shown by a preponderance of the evidence.**

Spencer's sole assignment of error is that the evidence was insufficient to support the verdict of second degree murder, and that mitigating factors of manslaughter were shown by a preponderance of the evidence. Spencer asserts that he and Wells had been in an on-again, off-again relationship for several years, and that on the night of the shooting, Spencer and Wells resumed a heated argument regarding the conclusion of their relationship, with Wells demanding he immediately move out of her home. Spencer argues that Wells attacked him with a broom during the argument, and he became agitated. Spencer argues that the evidence shows by a preponderance that Wells' demand that the relationship end and Spencer leave the home was sufficient provocation to deprive him of his self-control and cool reflection. Spencer asserts this resulted in him firing shots in the heat of blood or sudden passion, tragically ending the life of his long-time girlfriend. Spencer argues that considering the circumstances, he is entitled to a verdict for the responsive charge of manslaughter.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to

8

substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Morehead*, 55,825 (La. App. 2 Cir. 10/23/24), 400 So. 3d 302, *writ denied*, 24-01434 (La. 2/19/25), 400 So. 3d 932. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Walker*, 53,975 (La. App. 2 Cir. 6/30/21), 321 So. 3d 1154, *writ denied*, 21-01334 (La. 11/23/21), 328 So. 3d 83. Specific intent to kill can be inferred by the intentional use of a deadly weapon. *State v. Fields*, 42,761 (La. App. 2 Cir. 1/9/08), 973 So. 2d 973, *writ denied*, 08-0469 (La. 9/26/08), 992 So. 2d 983. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is guided by the standards of *Jackson v. Virginia*. *Id*.

Regarding Spencer's claim that he should have been convicted of the lesser offense of manslaughter, La. R.S. 14:31(A) provides, in pertinent part:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood had actually cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

Accordingly, for murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed in sudden passion or heat of blood; (2) that sudden passion or heat of blood was **immediately** caused by **provocation sufficient to deprive an average person of his self-control and cool reflection**; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. Kennell*, 54,577 (La. App. 2 Cir. 6/29/22), 342 So. 3d 437; *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2052 (La. 4/15/19), 267 So. 3d 1131.

A defendant who claims provocation, as a means of reducing murder to manslaughter, bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007). The question for the appellate court on review is whether a rational

trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Ary*, 56,273 (La. App. 2 Cir. 5/21/25), 411 So. 3d 972, 979-80; *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So. 3d 690, *writ denied*, 20-650 (La. 11/24/20), 305 So. 3d 104.

The evidence at trial clearly showed that Spencer did not act in sudden passion or heat of blood. First, there is no evidence in the record corroborating Spencer's contention that he was provoked by being struck with a broom and he bore no signs of injury or contact. Although Spencer may have been upset and angry, his claim about the conclusion of his romantic relationship is not enough to deprive an average person of his cool reflection and self-control. The record also shows that Wells had perceived a threat from Spencer when he said "over my dead body" in response to being asked to leave her home the day prior.

Most notably, Spencer did not commit the homicide immediately after the initial argument. Spencer left the home, went to sleep, went to work, and then returned to Wells' home armed with a firearm. Spencer arming himself with a firearm before returning to Wells' home indicates that the shooting was premeditated, rather than being a response to provocation during a second argument. Although Spencer claimed he only shot at Wells to scare her, the autopsy report revealed that he shot Wells seven times, and that the trajectories of the entrances and exits of two those multiple gunshot wounds indicated Wells was already on the ground when Spencer fired those shots into her. A rational trier of fact could reasonably conclude that seven shots at close range, all striking the victim – two of which from above when she is

11

on the ground – are indicative of the intent to kill, not the intent to scare. Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have concluded beyond a reasonable doubt that Spencer did not act in sudden passion or heat of blood when committing this homicide, and that no mitigatory factors were established by a preponderance of the evidence. Therefore, this assignment of error is without merit, and the jury's verdict of second degree murder was appropriate.

## CONCLUSION

For the foregoing reasons, Richard Refund Spencer's conviction of second degree murder and mandatory life sentence without benefit of probation, parole, or suspension of sentence are affirmed.

**AFFIRMED.**