Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,729-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DAVID WILSON WATERS                         Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 407,108

Honorable Donald Edgar Hathaway, Jr, Judge

* * * * *

THE HARVILLE LAW FIRM, LLC              Counsel for Appellant
By:  Douglas Lee Harville

JAMES E. STEWART, SR.                   Counsel for Appellee
District Attorney

CHRISTOPHER BOWMAN
TOMMY JAN JOHNSON
JASON WAYNE WALTMAN
Assistant District Attorneys

* * * * *

Before STONE, COX, and ELLENDER, JJ.

**STONE, J.**

This criminal appeal arises from the First Judicial District Court, the Honorable Donald E. Hathaway presiding. Pursuant to La. R.S. 14:81.2 (as cited verbatim in the bill of indictment),[1] David Wilson Waters ("Waters") was convicted of two counts of molestation of a juvenile under the age of 13, and sentenced to two 25-year consecutive sentences pursuant to La. R.S. 14:81.2(D)(1), i.e., the enhanced penalty provision applicable when the victim is under 13 years old. It is undisputed that the victims, H.H. and K.H.,[2] were in fact under the age of 13 years at the time of the offenses. Their birth dates and the date range of the offenses are alleged in the bill. However, the bill does not specifically cite subsection (D)(1) of La. R.S. 14:81.2. The trial court sentenced Waters pursuant to the enhanced penalty for molesting juveniles under the age of 13 years.

On appeal, Waters in effect urges three assignments of error: (1) the evidence is insufficient because of contradictions in the alleged victims' testimony and Gingerbread House interviews; (2) that, because the bill did not specify application of La. R.S. 14:81.2, subsection (D)(1), the sentences are illegal and that such is error patent;[3] and (3) alternatively, his sentences are excessive.

## FACTS

The victims are sisters. At the time they were molested, they were under the guardianship of their paternal grandmother, Debbie Holt

---

[1] Hereinafter, the "bill."

[2] H.H.'s birth date is November 4, 2008. K.H.'s birth date is November 13, 2009.

[3] Actually, the state raised this assignment of error. In his reply brief, Waters agrees with the prosecution as to the illegality of the sentences.

("Debbie"), of Keithville. Waters, Debbie's longtime concubine, lived in her residence beginning in 1996. The reason for the victims' placement with Debbie was that their parents — Nick Holt and Kimberly Scott ("Kimberly") — were abusing drugs. The victims called Debbie "Nana" and Waters "PawPaw."

In April 2017, Detective Jared Marshall ("Det. Marshall"), a 20-year veteran of the Caddo Parish Sheriff's Office, was assigned to investigate a complaint from the victims' mother involving child abuse. Det. Marshall scheduled an interview of H.H. at the Gingerbread House.

The interview was held on April 26, 2017. Lacie Hadley ("Hadley"), a forensic interviewer with the Gingerbread House, conducted the interview.[4] H.H. claimed she and K.H. had gone into the bedroom Waters shared with their grandmother to tell him good morning. Waters came out of the bathroom and told K.H. and H.H to get into bed with him. H.H. reported that Waters would try to get H.H. and/or K.H. to get into bed with him after they used the one working bathroom in their home, which was in the bedroom shared by Waters and their grandmother. H.H. and K.H. fell asleep after they laid down on the bed. At some point, K.H. left the room.

H.H. alleged that, after K.H. was gone, Waters began to molest her while she slept. Specifically, H.H. alleged that Mr. Waters rubbed her stomach, then moved lower, putting his finger in her "thing" and placing her hand on his "thing." H.H. stated that the molestation occurred while K.H. was not in the room. H.H. asserted that Waters held her down to keep her from leaving. H.H. claimed she was wearing towels wrapped around her

_____

[4] The video of the interview was introduced into evidence as S-1.

2

before Waters touched her, because she had taken a bath earlier.  She claimed she was not wearing any clothes other than her panties.  H.H. left when Waters went to the bathroom.  This was the first time Waters molested H.H.  The day of the incident, H.H. told K.H., but K.H. did not believe her.  H.H. stated that, the next day, she disclosed to Debbie that Waters had touched her inappropriately, but Debbie did nothing.  This incident occurred on a weekend and nobody else was home.

On May 3, 2017, Hadley likewise interviewed K.H., who was then 7 years of age and still living with Debbie.[5]  K.H. denied that she had ever been touched inappropriately.  However, K.H. said H.H. told her that Waters touched H.H. inappropriately, but K.H. did not witness anything herself.  K.H. did not know specifically what happened to H.H.  K.H. said H.H. told her on the day it happened to H.H.  She also stated that H.H. was wearing shorts or pants and a shirt when she was in the room with Waters.[6]

In late 2018, K.H. was around 9 years old and was seeing licensed professional counselor Stacie Cason-Laughlin.  In contradiction to her denial in the 2017 Gingerbread House interview, K.H. told the counselor that she had been inappropriately touched.  Accordingly, Cason-Laughlin reported the matter to the Caddo Parish Sheriff's Office, which scheduled another Gingerbread House interview for K.H.

K.H.'s second Gingerbread House interview took place on April 30, 2020.[7] By this time, K.H. was over 10 years old, and both she and H.H. were

---

[5] The video was introduced as S-2.

[6] In 2018, Det. Marshall was reassigned to a different department of the CPSO and the investigation was paused.

[7] The video was introduced at trial as S-3.

living with their mother, Kimberly.  Therein, K.H. reported that one morning when she got up and went to the restroom, Waters made her lie down with him and started "messing with" her.  She described Waters touching her, on the outside of her panties, in the area of her genitalia and can be seen making gestures toward that area on the video.  K.H. stated that she tried to get up and leave but Waters held her down with the same arm and hand with which he was touching her genitalia.  K.H. described Waters touching her private parts as "weird."  She stated it only happened one time, they were in Nana's room in Keithville, and that she and Waters were the only people in the room at the time it occurred.  K.H. stated that Waters had done this to H.H. before he did it to her.  He did not make K.H. touch him.

At trial, K.H. was over 15 years old, and could not explain why — in her first interview — she denied that Waters had inappropriately touched her.  She testified that she had told the truth in the 2020 interview in stating that Waters touched her private parts.  K.H. confirmed they were living with Debbie at the time.  When she got up in the morning, the only bathroom was in Debbie's room where Waters was.  Waters would make them get in bed with him after Debbie had left.[8]  They were alone with him.

H.H.'s testimony at trial affirmed the allegations she made in her Gingerbread interview.  H.H. was 16 years of age at the time she testified.  H.H. stated Waters made her touch his private parts and Waters touched her private parts.  She identified Waters in court as PawPaw.  She testified that, after Waters committed the offense, she told K.H. and Debbie, but Debbie did nothing.

---

[8] Debbie, in her testimony, admitted she left home for work in time to be there by 4 a.m.

The trial court accepted Hadley as an expert witness in the field of forensic interviewing of children regarding sexual abuse and cases involving delayed disclosures. Hadley explained the purpose of the Gingerbread House and her experience and role as a forensic interviewer of children in sexual abuse cases. She stated that she, as an interviewer, did not make conclusions or give advice about the truthfulness of interviewee's allegations. Hadley stated that she, as an interviewer, offers the children a safe, neutral environment and uses nonleading questions. Hadley stated that H.H., who was 8 years of age at the time of this interview, had trouble putting things in chronological order from beginning to end, and generalized that children at that age have challenges in being able to put things in chronological order.[9]

In the defense's case-in-chief, Waters testified along with Debbie and Dakota Holt (a teenage relative). Debbie testified that Waters was never alone with K.H. and H.H. Debbie testified that the children slept next door at the home of her daughter, Brandy Holt ("Brandy"), every night and Waters refused to be left alone with H.H. and K.H. Debbie admitted that, during the relevant timeframe, she had to be at work by 4 a.m. Debbie denied that H.H. made any allegations to her and admitted she never called law enforcement.

Dakota Holt ("Dakota") testified that, based upon his observations, Waters was never alone with H.H. and K.H. At the time of the alleged

---

[9] Hadley testified regarding delayed disclosure involving abuse where children may delay disclosures for days, weeks, and even years. An additional challenge Hadley noted was that discussing the subject of abuse is difficult for children if they do not want to think about it. As a part of the education of the children, Hadley helps the children understand their safety network and grown-ups they can trust if abuse happens.

offenses, Dakota was still living in the home with Debbie and Waters and worked with Waters.

Waters took the stand and denied that he touched H.H. or K.H. Waters said he made it a point not to be alone with H.H. and K.H. Waters admitted that the victims had a bedroom in his (Debbie's) home but alleged that the victims always slept at Brandy's house next-door. However, the prosecution impeached this claim with the video of Waters's interview with Det. Marshall, which was played outside the presence of the jury. Thereafter, the jury returned and cross-examination resumed:

Q. Okay. Now, we just watched a portion of your interrogation with Detective Marshall. Did that refresh your memory?

A. Yes, sir.

Q. Okay. And, in that interview, did you not, in fact, say that they would sleep in their room, and they wouldn't sleep anywhere else?

A. (No response).

Q. You further said that Debbie would bring them [the victims] over to Brandy's house at 3:00 or 4:00 every morning, correct?

A. Yes, sir, I did. But—

Q. So were you lying then or are you lying now?

Q. Which was true, they slept at the house, or they went over [to Brandy's] every morning at 3:00 or 4:00?

A. I was under the assumption that they were sleeping at the house.

Q. I'm not talking about assumptions. What was true? Did they sleep at the house, or did they go over [to Brandy's] at 3:00 or 4:00 every morning?

A. They went over to Brandy's house to sleep every night.

Q. So you lied to Detective Marshall?

A. I was misinformed because I went to bed early. When I went to bed, I thought the kids were actually sleeping at our house. They weren't.

In rebuttal testimony, Det. Marshall stated the children told him that they slept at Debbie's house and would go to the bathroom every morning between 3 a.m. and 4 a.m. — the bathroom connected to the bedroom that Debbie and Waters shared. Additionally, Det. Marshall stated that Debbie never came forward to inform him of the alibi, i.e., that Waters was never alone with the children.

Also in the prosecution's rebuttal, the victims' mother, Kimberly, stated that Debbie admitted to her that H.H. had reported Waters' offenses to her (Debbie) i.e., that Waters was "messing with" H.H. However, Kimberly also reported that (Debbie said) H.H. had alleged that two of Kimberly's ex-boyfriends had also "messed with her" and Kimberly dismissed these accusations as false.[10]

Brandy (Holt), the key alibi witness, was not called to testify.

### INDICTMENT, JURY CHARGE, AND VERDICT FORM

The bill of indictment states that Waters committed the offenses on or about January 1, 2016, through April 30, 2017. The superseding bill states the birth dates of H.H. and K.H., but did not allege the victims were under the age of 13, nor did the bill reference the sentencing provisions of La. R.S. 14:81.2(B)(2) or (D)(1).

---

[10] Kimberly testified in rebuttal that any alleged financial incentive involving some sort of inheritance from her grandmother, Patricia King, at the time the molestation in April 2017, could not have occurred as Patricia King did not pass away until August 2019.

Waters, through counsel, waived the reading of the bill and entered a not guilty plea to the superseding bill.

The trial was held on February 25, 2025. The court did not charge the jury regarding molestation of a juvenile under the age of 13. The verdict forms on each count reflected a verdict of guilty as charged of molestation of a juvenile under the age of 17 *and*, in a separate line, under age 13.

## DISCUSSION

**Legal standard for sufficiency of the evidence**

A recent decision, *State v. Jones*, 55,464 (La. App. 2 Cir. 1/10/24), 379 So. 3d 828, writ denied 24-00194 (La. 10/8/24), 394 So. 3d 267, involved sex crimes against victims under the age of 12 and delayed reporting of the offenses. On appeal, the defendant attacked the sufficiency of evidence. This court reiterated the longstanding standard of review, stating:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L.Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. *Steines, supra*. The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *Steines, supra*. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *Steines, supra*. It is the province of the factfinder to resolve conflicting inferences from the evidence. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness—if believed by the trier of fact—is sufficient to support the

requisite factual conclusion. Such testimony alone is sufficient even where the State does not introduce medical, scientific, or physical evidence. This is equally applicable to the testimony of sexual assault victims.

The applicable version of La. R.S. 14:81.2 provides:

> (A)(1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juveniles age shall not be a defense.

**Arguments**

**Defense argument re K.H.** Waters's argument attacks the credibility of the testimony offered as proof of his alleged offense against K.H. First, in her April 26, 2017 interview, H.H. denied that K.H. had ever been abused. Second, in her May 3, 2017 interview, K.H. denied she had been abused; (however, K.H. therein reported that H.H. told K.H. that Waters had molested H.H.) These denials narrowly straddled April 30, 2017, i.e., the end of the date range alleged in the bill of indictment. K.H. later reversed course and alleged that Waters did molest her — in counseling in 2018, in her second Gingerbread interview in 2020, and at trial in 2025. However, in her trial testimony, H.H. did not recant her earlier statement that K.H. had not been abused. Finally, H.H. also denied that Waters had done anything to K.H.

**Defense argument re H.H.** The defense also impugns the credibility of H.H.'s account of the molestation. She stated that she had taken a bath,

9

was wrapped in towels, and wearing only panties as clothing when Waters molested her. However, she also stated that the encounter began with her and K.H. going into Waters' bedroom to tell him "good morning." She never explained how she went from going to say "good morning" to bathing and then getting in the bed with Waters wearing only panties and wrapped in towels. On the contrary, K.H. stated in her first interview that H.H. was wearing shorts or pants and a shirt when she was in the room with Waters on the day H.H. was allegedly molested.

Additionally, in her Gingerbread interview, H.H. stated that two of her family members told her that Waters is a "sex defender" before she made these allegations against him. This part of the video was not played for the jury because it would have constituted "other crimes" evidence.[11] Had the jury been aware of this, it may have viewed this as improperly influencing H.H. to make the accusation.

**Prosecution's argument.** Waters's argument referencing inconsistencies speaks to the weighing of the facts and credibility of the jury. Moreover, the jury heard the testimony of the expert forensic interviewer and licensed professional counselor regarding the delayed responses of sexually abused children and trauma associated with sexual abuse. Here, H.H. exhibited lack of trust and stated the frustration of reporting the touching to Debbie and her doing nothing. Moreover, the jury could understand from the child's perspective why a child would delay disclosure and their potential fear and frustration associated with disclosure. Debbie

---

[11] Likewise, K.H. talked about the same exact "other crimes" information in her second Gingerbread interview. S-3, 8:45 to 8:57.

was the guardian in physical custody of the children at the time of the first interviews. Certainly, H.H. and K.H. could not know whether they would return to that home or not. The jury heard the evidence, weighed it, and made factual determinations resulting in the conviction of Waters on two counts of child molestation. The state contends that the testimony of H.H. and K.H. is sufficient to sustain the convictions.

**Analysis**

The molestation of a young child is unfathomably disgusting and evil. Our law accordingly prohibits and punishes such conduct. However, the guilt of a person accused of such a heinous act must be proved beyond a reasonable doubt — by the trial evidence alone — before the penalty of the law may attach. This strikes an important balance. Most, if not all, would agree that (1) to be falsely convicted of such a crime may be an outcome worse than death; yet (2) to set free a person guilty of such a crime is an extreme and intolerable injustice and a danger to society. The power and responsibility of the jury in such a case is immense, and we undertake our review with reverent care.

The prosecution, in its brief to this court, used the expert testimony of Lacie Hadley, the Gingerbread House interviewer, to insinuate credibility of the accusations against Waters by explaining the contradictions between and within the testimony of H.H. and K.H. Hadley did this merely by offering generalizations about children having trouble recounting events in chronological order, accurately describing details, and delaying disclosure, not whether contradictions in the accounts given by *these children in this case* are a result of such age-based incompetencies. Moreover, Hadley

11

described her role as a neutral facilitator who makes no conclusions and offers no advice regarding the credibility of her interviewees. She therefore *disclaimed* any special competence in determining credibility of or explaining contradictions in interviewees' statements.

Regardless, the jury had ample ground (without that aspect of Hadley's testimony) to conclude that H.H. and K.H. told the truth. Both testified when well into their teenage years and affirmed their earlier accusations in the Gingerbread House interviews. The only conflicts regarding H.H.'s account of the event involve surrounding circumstances of low importance. She was never equivocal or inconsistent about what Waters did to her. She even described the motion he made with his finger while it was inside her and how he held her down with the same arm he used to molest her.

K.H.'s testimony was more problematic, but nonetheless sufficient. In her first Gingerbread House interview, she at first denied having been molested; this is also reflected in H.H.'s unretracted statement that K.H. had not been molested. However, the prosecution points out that K.H. still lived with Debbie at the time of her first Gingerbread House interview. As explained in the following paragraphs, the testimony of Debbie and Waters demonstrates that the jury could reasonably have concluded that Debbie's reaction to H.H.'s accusation initially deterred K.H. from disclosing the truth, i.e., from accusing Waters.

Debbie and Waters were the primary witnesses to testify in Waters's defense. H.H. reported that she first told Debbie about Waters's molestation of her and that Debbie did not believe her; K.H. corroborated this and

12

explained that she (K.H.) did not believe H.H. at the time either. In contrast, Debbie claimed H.H. never said anything of the sort to her.

In a videotaped interview with Det. Marshall, Waters admitted that the girls had their own bedroom at Debbie's house and slept there every night, but claimed Debbie woke them up between 3 a.m. and 4 a.m. and took them next-door to Brandy's house to sleep a few more hours (i.e., instead of leaving them alone with him). However, at trial, Debbie and Waters both testified that Waters was never alone with the girls and they always spent the *whole* night next door at Brandy's house. Debbie went as far as to claim that this was pursuant Waters's desire to preempt any false accusations (which Debbie feared would be instigated by the girls' mother, with whom Debbie had an acrimonious relationship).

At trial, Waters tried to explain his contradictory statements by claiming he went to bed *so* early that he was unaware that Debbie was actually taking the girls to Brandy's for their bedtime in the evening — i.e., rather than between 3 a.m. and 4 a.m. In other words, Waters said that his statement to Det. Marshall was based on what he (Waters) had subsequently discovered was an erroneous assumption regarding *when* the girls went to Brandy's house. All four of the following conditions would be necessary for Waters's explanation of his self-contradiction to be true: (1) during the 16-plus months that the girls resided in Debbie's home, the girls *always* went to Brandy's house every single night that they were in Debbie's custody; (2) during the 16-plus months that the girls resided in Debbie's home, Waters *always* went to bed before the girls went to Brandy's house in the evening; (3) during 16-plus months that the girls resided in Debbie's home, *nobody ever said anything* to or in front of Waters that would have made him aware

13

that the girls were going to Brandy's house at their bedtime; and (4) despite his sleeping in the bedroom attached to the only functional bathroom in the house, Waters *never* was awakened while Debbie and the girls were up as Debbie got ready for work and to bring the girls to Brandy's house, i.e., he *never* heard or saw the girls during the 3 a.m. hour despite their being up at that time every single morning they (the girls) were living there. In light of Waters's contradictory statements and his dubious attempt to explain how he was mistaken in the interview with Det. Marshall, the jury is in the best position to determine the credibility of a witness. Furthermore, the alibi story bears a strong odor of collusion between Debbie and Waters. This is especially so considering that the defense did not call Brandy to testify in verification of the alibi story, despite her necessarily having accurate personal knowledge of the story's truth or falsity.

The jury could reasonably infer that Debbie: (1) willfully refused to believe that her live-in boyfriend had molested her granddaughters while they were living in her home; and (2) went as far as to concoct an alibi story to maintain her denial. Among other things, this is ground for the jury to permissibly infer that Debbie was part of the reason for K.H.'s initial denial of having been molested — which K.H. gave as a 7-year-old while she was still living in Debbie's home.

Accordingly, Waters's alibi story gave the jury ample justification to: (1) reject his testimony in denial of the charges; and (2) credit K.H.'s accusations against him — despite her initial denial, which she reversed upon leaving Debbie's custody. The evidence is sufficient to support the convictions.

## ERROR PATENT: ILLEGAL SENTENCE

The prosecution argues that the sentences are illegal (illegally harsh), that this is an error patent, the sentences should be vacated, and the case remanded for resentencing pursuant to La. R.S. 14:81.2(B), i.e., the penalty provision applicable when the victim is *over* 13 years of age. The prosecution argues that Waters was not validly charged with the higher grade of the offense pursuant to which he was sentenced, because: (1) the bill's statutory citation, in full, is merely "R.S. 14:81.2" – rather than specifically citing subsection (D)(1) thereof; and (2) the factual allegations in the bill do not verbatim state that the victims were "under the age of 13 years." Waters adopts this argument. We do not.

La. C. Cr. P. art. 920 defines the scope of appellate review:

> The following matters and no others shall be considered on appeal: (1) An error designated in the assignment of errors; and
> (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

In *State v. Kelly*, 15-0484 (La. 6/29/16), 195 So. 3d 449, 456, the Louisiana Supreme Court explained that error patent review, in general, only considers the indictment or information, the minutes, the verdict, and the sentence.

In *State v. Chester,* 24-00207 (La. 6/27/25), 413 So. 3d 384, 386, the Supreme Court found that the trial court erred in sentencing a defendant pursuant to a higher grade of the offense (with a higher sentencing range) than was necessarily charged. Therein, the bill of indictment stated:

> R.S. 14:89.1(A)(2) AGGRAVATED CRIME AGAINST NATURE – INCESTUOUS SEXUAL ACTS
> Malcolm J. Chester, on or about September 1, 2019, through October 15, 2019, did engage in any of the prohibited acts enumerated in Subparagraph (b) of this

> Paragraph with the victim, A C, who is under the age of eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives…

The bill did not contain any allegation indicating the victim was under the age of 13 years. *Id.*

The provisions of La. R.S. 14:89.1(A)(2) (the subsection of the statute cited in the bill charging Chester) define the crime *without* making any distinction between victims under 13 years old and victims between 13 and 18 years old. *Id*. However, La. R.S. 14:89.1(C) establishes two possible sentencing ranges for violations of La. R.S. 14:89.1(A)(2). Which penalty provision is applicable depends whether the victim was under the age of 13 years:

> (1) Whoever commits the crime of aggravated crime against nature as defined by Paragraph (A)(2) of this Section shall be fined an amount not to exceed fifty thousand dollars, or imprisoned, with or without hard labor, for a term not less than five years nor more than twenty years, or both.
> (2) Whoever commits the crime of aggravated crime against nature as defined by Paragraph (A)(2) of this Section *with a victim under the age of thirteen years* when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

The *Chester* court held that the conviction and sentence for the higher offense were invalid, stating:

> Defendant was charged with violating La. R.S. 14:89.1(A)(2), aggravated crime against nature when the victim (defendant's 12-year-old daughter in this instance) is under the age of eighteen. *However, the bill of information was incomplete in that it failed to list the victim's date of birth, nor did it reference which of two potential penalty provisions, La. R.S. 14:89.1(C)(1) or La. R.S. 14:89.1(C)(2), would apply*. Defendant was convicted

16

> after the jury was instructed under subsection (C)(2), and then sentenced accordingly. *Under the circumstances, the court of appeal was correct to find the charging instrument defective, as a fact that significantly increased the maximum penalty for the crime — the vicitm's* [sic] *age—was not charged in the bill of information.* (Emphasis added; internal case citations omitted.)

*Id.* The *Chester* court reduced the conviction to the lesser offense – finding that the defendant had only been charged with such – and remanded for resentencing. The court so ruled even while granting that (1) the prosecution had in fact proved the higher offense; (2) the trial court had instructed the jury regarding the higher grade of the offense; and (3) the jury found the defendant guilty of the higher grade of the offense on the verdict form. Also, the defendant, at all relevant times, presumably knew his own daughter's age.

*Chester, supra,* must be distinguished from the instant case. In this case, the parties' argument is that the bill did not charge Waters with the enhanced offense because it did not specify the enhanced penalty provision in its citation of La. R.S. 14:81.2 or state verbatim that the victims were "under the age of 13 years." *Chester, supra,* held that bill's failure to allege the age of the victim was sufficient to invalidate the conviction for the higher grade of the offense. Such did not occur in this case. The bill in this case alleged the birth dates of both victims and the date range within which the offenses occurred. Thus, the bill's allegations clearly indicate that the victims were under the age of 13 years at the time they were molested. Likewise, the jury specifically found that the victims were under 13 years of age as per the verdict form.

However, the parties seem to argue that *Chester* further indicates that the bill's failure to specify the higher grade of the offense *by specific citation*

17

*to that subsection of the statute* categorically renders the bill insufficient to support a conviction for the higher grade of the offense. On this point, La. C. Cr. P. art. 464 saliently states:

> The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. *Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.*[12] (Emphasis added.)

La. C. Cr. P. art. 464 contemplates omission of the entire citation or a material misstatement in the citation set forth in the bill. In this case, however, the bill cites the entire statute defining and penalizing Waters's offenses and clearly indicates that the victims were under the age of 13 years at the time of the offenses.[13] The bill, therefore, is not erroneous or deficient.

Furthermore, even if the bill were deemed deficient because it does not specifically cite subsection (D)(1) of La. R.S. 14:81.2, such would not necessarily require that the sentence be vacated. In light of La. C. Cr. P. art. 464 and *Johnson*, *supra,* we would hold that the bill's failure to specify the higher grade of the offense by statutory citation or by saying the magic words, that the victims were "under the age of 13 years," would not *per se* require that the defendant be granted relief even if such omission did constitute a deficiency. Rather, the defendant would have to also show he

---

[12] Likewise, the Louisiana Supreme Court's jurisprudence holds that errors in and/or omissions from the bill's statutory citation are not grounds for relief absent a showing that the defendant was thereby prejudiced. *State v. Johnson*, 404 So. 2d 239 (La. 1981).

[13] Again, the bill provided the victims' respective initials, birth dates, and the date range of the offenses.

was prejudicially misled by the bill's failure to so specify. Under the circumstances of this case, such would be a matter requiring the taking of evidentiary proof. Therefore, even if the bill's failure to specify the higher offense by citing subsection (D)(1) was error, that would be neither an error patent nor an error assigned by Waters, and therefore, the matter of vacating the sentence as the parties suggest still could not be decided in this appeal. La. C. Cr. P. art. 920.

**Excessive sentence**

Waters argues that the trial court violated his constitutional rights by ordering that the two 25-year sentences (i.e., the minimum under La. R.S. 14:81.2(D)(1)) be served consecutively, practically imposing a 50-year sentence. This, Waters argues, would effectively be a life sentence, since he is 64 years old.[14]

La. Const. art. I, § 20 provides: "No law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment."

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bell*, 53,712 (La. App. 2 Cir. 1/13/21), 310 So. 3d 307. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166.

---

[14] Neither in this appeal nor in his motion to reconsider sentence does Waters argue noncompliance with La. C. Cr. P. art. 894.1. Therefore, La. C. Cr. P. arts. 881.1(E) and 920 preclude our consideration of that issue. Our review is limited to the bare claim of excessiveness.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Bell*, *supra*.

However, even a sentence at the absolute minimum of the statutory range may be constitutionally excessive under the circumstances of a given case. *Dorthey*, *supra*.

La. C. Cr. P. art. 883 provides the following relative to concurrent and consecutive sentences:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.

The trial court did not abuse its discretion in imposing consecutive sentences that will, in all likelihood, amount to a life sentence for Waters. The jury reasonably concluded that the evidence proved beyond a reasonable doubt that Waters molested two children — a 7-year-old and an 8-year-old.[15] For purposes of our appellate review of Waters's sentences, the correctness of the jury's conclusion cannot be doubted. The trial court did not abuse its

---

[15] The threshold for the higher grade of the offense is that the victim is under 13 years of age, and Waters's victims were nowhere close to reaching the age of 13.

discretion in ordering that Waters be separately punished with respect to each victim — each victim will separately suffer the lifelong harm Waters inflicted.  Furthermore, the fact that Waters was in his mid-50s when he committed these crimes neither lessens his culpability nor the harm he caused.  Waters's likely inability to outlive the sentences is irrelevant to the question of constitutional excessiveness.  Waters's effective 50-year sentence is neither cruel, nor excessive, nor unusual, and the constitution does not require favoritism for older criminals.

## CONCLUSION

Waters's convictions and sentences are **AFFIRMED.**

**AFFIRMED.**